UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SALEEM AHMAD, RASHID ABDULLAH, NASEER AHMED, MOHAMMAD HASAN, SYED KAZMI, MUHAMMED RAHMAN, SYED RAZA and HAIDER SYED,

Plaintiffs,

-v-

NEW YORK CITY HEALTH AND HOSPITALS CORPORATION; EBONÉ CARRINGTON, Chief Executive Officer of Harlem Hospital Center, in her individual and official capacities; HINNAH FAROOQI, Associate Executive Director of Harlem Hospital Center, in her individual and official capacities,

Defendants.

20 Civ. 675 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Plaintiffs are eight Pakistani-born, Muslim pharmacists who bring employment claims against their employer, New York City Health and Hospitals Corporation ("H+H"); Harlem Hospital Center's Chief Executive Officer, Eboné Carrington ("Carrington"); and a supervisor, Hinnah Farooqi ("Farooqi").  They claim to have suffered discriminatory treatment based on race, ethnicity, national origin, religion, and age, and retaliation for challenging these practices. Plaintiffs' 15 causes of action fall into seven clusters:  (1) claims of disparate treatment, hostile work environment, and retaliation on the basis of race, ethnicity, national origin, and religion, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* ("Title VII"), the New York State Human Rights Law, New York Exec. Law § 296 *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(a) *et seq.* ("NYCHRL"); (2) claims of discrimination and retaliation based on race and ethnicity under 42 U.S.C. § 1983,

and related claims under Article 1, § 11 of the New York State Constitution; (3) claims of

discrimination on the basis of race and ethnicity in violation of 42 U.S.C. § 1981; (4) claims of

discrimination on the basis of age under the Age Discrimination in Employment Act, 29 U.S.C.

§ 621 *et seq.* ("ADEA"); (5) a claim under *Monell v. Department of Social Services*, 436 U.S.

658 (1978), against H+H alleging a discriminatory and retaliatory custom, policy or practice, and

a *Monell* policymaker claim against H+H alleging that Carrington and Farooqi created or

approved of discriminatory policies; (6) a claim under 42 U.S.C. § 1985(3) alleging conspiracy

to interfere with plaintiffs' civil rights; and (7) a claim for retaliation in violation of the First

Amendment of the Constitution, also brought under § 1983, and related claim under the New

York State Constitution.

      Before the Court is defendants' motion to dismiss under Federal Rule of Civil Procedure

12(b)(6).  For the reasons that follow, the Court grants the motion in part and denies it in part.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Parties

      H+H is a public-benefit corporation that operates hospitals, clinics, and care facilities in

New York City.  Compl. ¶¶ 19–20.  Harlem Hospital Center ("HHC") is one such public hospital

in the H+H system.  *Id.* ¶ 21.  Carrington is HHC's Chief Executive Officer.  *Id.* ¶ 22.  Since

---

[1] This factual account draws primarily from the Complaint, Dkt. 1 ("Compl.") and documents that have been incorporated by reference in the Complaint.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2014, Farooqi has been HHC's Associate Executive Director.  *Id.* ¶¶ 23, 29.  Farooqi directly supervises Hans Go ("Go"), HHC's Assistant Director of the Pharmacy.  *Id.* ¶ 24.  Farooqi is a non-Sunni Muslim woman of Indian descent.  *Id.* ¶ 23.

Plaintiffs are eight Pakistani-born, Muslim men over age 40.  *Id.* ¶ 10.  They identify their national origin as Pakistani and their race and ethnicity as South Asian.  *Id.*  Some identify as Muslim; others, as Sunni Muslim.  *Id.* ¶¶ 11–18.  All eight are pharmacists at HHC.  *Id.* Individual plaintiffs' backgrounds are discussed *infra*.

### 2.   Individual Plaintiffs' Experiences at HHS

#### a.   *Saleem Ahmad*

Saleem Ahmad ("Ahmad"), age 65, is Pakistani-born and Sunni Muslim.  *Id.* ¶ 43.  He has worked for HHC since 2007.  *Id.*  He is a Level III pharmacist, a Tour III supervisor,[2] the pharmacy department's union representative to Local 1199 of the Service Employees International Union ("SEIU"), and the highest-ranking Pakistani pharmacist at HHC.  *Id.*  He is an adjunct faculty member at New York Medical College.  *Id.*

Ahmad alleges that Farooqi has reduced his supervisory responsibilities and institutional prominence at HHC.  *Id.* ¶ 45.  He alleges that his name and contact information were not included in the orientation booklet given to incoming residents.  *Id.* ¶ 46.  He further alleges that Farooqi, since becoming Associate Executive Director ("AED") of HHC, has understaffed his Tour III shift despite a contrary recommendation in September 2015 from HHC's labor relations department.  *Id.* ¶ 48.  Due to this routine understaffing, Ahmad must perform certain front-end Level I pharmacist duties, which have "compromised" his supervisory duties.  *Id.* ¶ 49.  As a

---

[2] HHC refers to shifts as "Tours."  Compl. ¶ 36.  Tour I is the 12 a.m. to 8:30 a.m. shift; Tour II is the 8 a.m. to 4:30 p.m. shift; and Tour III is the 4 p.m. to 12:30 a.m. shift.  *Id.*

result, Ahmad has been left without support in the main pharmacy for multiple hours with an increased workload. *Id.* ¶ 50. Farooqi and her direct reports remove pharmacists from Tour III to fill emergency needs on Tours I and II. *Id.* ¶ 54. They also transfer work responsibilities, such as code-cart preparations and expired medication checks, from Tour II to Tour III. *Id.* In 2018, Ahmad alleges, he requested increased staffing of Tour III to allow him to complete annual evaluations of the staff he supervised. *Id.* ¶ 57. Instead, responsibility for the evaluations was given to a "a younger non-Pakistani" who had not supervised or observed the staff. *Id.*

Ahmad further alleges that Farooqi has restricted his access to certain pharmacy areas, including the pharmacy office, the conference room, copying and scanning facilities, and the procurement office. *Id.* ¶ 51.

Ahmad further alleges that Farooqi has barred him from using office space, desk space, and shelf space in the pharmacy department for journal articles he writes. *Id.* ¶ 55. On May 19, 2019, Ahmad alleges, Farooqi, Go, and Gurdeep Sareen ("Sareen"), a non-Pakistani born pharmacist, *id.* ¶ 52, "aggressively" approached Ahmad and ordered him to remove research documents from an area near a window, *id.* Ahmad alleges that this incident was shared with human resources and "labor relations executives" at HHC. It is unclear when the incident was reported and whether it was Ahmad who reported it. *Id.*

In or around April 2018, Ahmad alleges, Farooqi instructed Farrukh Zaman ("Zaman"), a former Assistant Director, to change Ahmad's performance evaluation from "above satisfactory" to "satisfactory." *Id.* ¶ 58. Zaman refused to do so and submitted a complaint about the order, calling it an "injustice." *Id.* ¶ 59. The Complaint does not reflect to whom this complaint was made.

4

On September 9, 2019, Ahmad received a Notice and Statement of Charges against him, whose 24 specifications detailed conduct "for which younger, non-Pakistani pharmacists were not disciplined." *Id.* ¶ 60.  Ahmad pleads that these specifications are unmerited and fabricated and brought in retaliation for making internal complaints to H+H's EEO office in January 2019.[3] *Id.* ¶¶ 38, 60–61.  Specifically, Ahmad notes that one charge accuses him of having made a comment about an Assistant Director on a certain day in front of pharmacy staff, a day that Ahmad was scheduled as having had off.  *Id.* ¶ 61.  He alleges that another charge was related to "his performing religious ablutions."  *Id.*  As of the filing of the Complaint, Ahmad had not received a hearing.  *Id.* ¶ 62.

b.    *Rashid Abdullah*

Rashid Abdullah ("Abdullah"), age 56, is Pakistani-born and Sunni Muslim.  *Id.* ¶ 63. He has been employed as a staff pharmacist with HHC since 2010.  *Id.*  He is currently a Level II pharmacist.  *Id.*  He has general pharmacy experience and specialized skills in pediatric pharmacy and medications.  *Id.* ¶ 64.

Abdullah was hired in September 2010 as a part-time Level I pharmacist.  *Id.* ¶ 63.  In August 2013, Abdullah accepted a position working as a full-time Level I pediatric pharmacist with a four-day per-week working schedule.  *Id.* ¶ 65.  Abdullah travels from Buffalo weekly and accepted the position on the basis that he would work four days per week.  *Id.*  On or about January 15, 2015, Abdullah was promoted to a Level II pediatric pharmacist but continued to commute from Buffalo, working double shifts.  *Id.* ¶ 66.

Abdullah alleges that he has applied for Level III pharmacist positions since 2016 but has not been promoted despite nine years of service and excellent recommendations.  *Id.* ¶¶ 68–69.

---

[3] The Complaint does not reflect the day in January 2019 on which the internal complaint to H+H's EEO office was filed.

One was a Level III pharmacist position posted on the H+H website in or about August 2016. *Id.* ¶ 69. "Upon information and belief," Abdullah alleges that the positions were awarded to less qualified non-Pakistani pharmacists. *Id.* ¶ 70. Abdullah identifies two such appointments. Curtis Chin, a non-Pakistani pharmacist in his mid-30s who began working at HHC in November 2010 as a Level I pharmacist, was promoted to an unposted Level III clinical pharmacist post in or about August 2018. *Id.* ¶ 71. Sareen, a non-Pakistani pharmacist in his mid-30s who began working at HHC in December 2018, was hired directly as a Level III clinical pharmacist despite having limited or no clinical experience as a hospital or clinical pharmacist. *Id.* ¶ 72. Abdullah alleges that he was not notified of this vacancy. *Id.*

Abdullah alleges that he receives disparate treatment with respect to his schedule. He alleges that non-Pakistani pharmacists are afforded more scheduling flexibility, while he must adhere to the strict Tour I, Tour II, and Tour III hours. *Id.* ¶ 75. He also alleges that on June 2, 2015, Farooqi abruptly changed his shifts despite knowing that he had booked travel from Buffalo months in advance. *Id.* ¶ 76.

Since Farooqi became AED, Abdullah's performance evaluations have dropped from "above satisfactory" to "satisfactory," despite Farooqi expressing positive verbal reviews of his work, including stating that she "[wished she] could clone [him]." *Id.* ¶ 77. Abdullah alleges that he has not received an annual performance review since 2018. *Id.* ¶ 78.

In February 2018, Grace Nnoli ("Nnoli"), a non-Pakistani pharmacist, was made a supervisor and later removed all of Abdullah's pediatric and neonatal responsibilities. *Id.* ¶ 79. He has not since been scheduled for pediatric multidisciplinary rounds, despite repeated requests. *Id.* ¶ 80. In January 2019, Abdullah, then a designated clinical pharmacist in the pediatric unit, was transferred to the intravenous admixture ("IV") room, while Mina Eid, a younger non-

Pakistani Level I pharmacist, was permitted to work in the Adult Intensive Care Unit.  *Id.* ¶¶ 81–82.  Abdullah alleges that he is required to perform Level III tasks despite not receiving Level III pay or status.  *See id.* ¶ 74.  In contrast, Mina Eid, a younger non-Pakistani Level I pharmacist, is permitted to perform Level III clinical pharmacist tasks in the Adult Intensive Care Unit ("AICU").  *Id.* ¶ 82.

Abdullah alleges having been "bullied and intimidated" by Farooqi and supervisors.  He points to an incident in June 2019, when Go "chastised" Abdullah for using sick days, and called out Abdullah multiple times in a six-month period, resulting in his receiving a "red flag."  *Id.* ¶ 83.  "Upon information and belief," no non-Pakistani pharmacist has received a "red flag" for similar conduct.  *Id.*

On or about June 26, 2019, Abdullah raised safety concerns about the newly built IV room and its lack of a fire alarm and sprinklers.  Farooqi "strongly admonished" Abdullah in front of Go for expressing these concerns.  *Id.* ¶ 84.  Abdullah, who works in the IV room, cannot hear fire alarms while preparing intravenous admixtures.  *Id.*

### c.   *Naseer Ahmed*

Naseer Ahmed ("Ahmed"), age 68, is Pakistani-born and Sunni Muslim.  *Id.* ¶ 85.  He has worked at HHC for 14 years and is currently a Level I pharmacist.  *Id.*  Ahmed has not been promoted or offered a promotion from Level I; but younger, less qualified, and less experienced non-Pakistani pharmacists have been promoted.  *Id.* ¶ 88.  Ahmed does not identify a specific post to which he has applied or of which he was not given notice.  Nor does he plead when these promotions of other pharmacists occurred.

Ahmed's performance evaluations have dropped from "above satisfactory" to "satisfactory," but the Complaint does not specify during what period that change occurred.  *Id.*

¶ 89.  When he was injured at work, "upon information and belief," Farooqi instructed Human Resources not to grant him sick leave, which delayed his disability benefits.  *Id.* ¶ 90.

Ahmed describes having been subjected to "retaliatory acts," including a five-day suspension for "conduct for which non-Pakistani pharmacists are not disciplined."  *Id.* ¶ 91.  In April 2018, he was disciplined for not wearing gloves while fulfilling an emergency medication request, even though it is not against policy not to wear gloves when fulfilling such requests.  *Id.* Ahmad, his immediate supervisor and a witness, was not allowed to participate in Ahmed's review, which also violated H+H policy.  *Id.*

Ahmed alleges that Nnoli, after being promoted to supervisor, asked when Ahmed was going to retire and told him if he did not retire his record would be "ruined."  *Id.* ¶ 92.  Ahmed filed an internal complaint to H+H's EEO office, in which he alleged that Farooqi was "targeting pharmacists of Pakistani origin by pressuring them to leave [HHC] so that she can hire new employees of her choice."  *Id.* ¶ 93.

### d.    Mohammad Hasan

Mohammad Hasan ("Hasan"), age 70, is Pakistani-born and Sunni Muslim.  *Id.* ¶ 94.  He started at HHC in 2005 as a Level I pharmacist and, within three years, was promoted to Level II.  *See id.* ¶ 95.  Hasan remains a Level II pharmacist.  *Id.*  He is experienced in all areas of the pharmacy, including in the outpatient pharmacy.  *Id.* ¶ 96.

Hasan has not been promoted or received notice of promotion opportunities, while younger, less qualified, and less experienced, non-Pakistani pharmacists were notified of promotions and received promotions.  *Id.* ¶ 98.  In 2014, Hasan was qualified and eligible to become a Level III outpatient pharmacy supervisor, but the position was given to Marie Duliane Milord Jean Gilles ("Gilles"), a younger, less qualified, and less experienced Level I, non-Pakistani pharmacist.  *See id.* ¶ 99.  Hasan is scheduled to work in the satellite pharmacies with

the highest workloads, while junior, non-Pakistani pharmacists are scheduled at pharmacies with lower workloads.  *Id.* ¶ 100.

e.        *Syed Kazmi*

Syed Kazmi ("Kazmi"), age 71, is Pakistani-born and Muslim.  *Id.* ¶ 101.  He has been employed at HHC for approximately 30 years as a Level I pharmacist.  *Id.*  He received his medical degree in the Dominican Republic in 1986.  *Id.*  Kazmi has worked in all pharmacy department areas, including, injectables, chemotherapy, dispensing, outpatient, inpatient, and procurement.  *Id.* ¶ 103.

Kazmi has repeatedly received excellent and above satisfactory performance evaluations, *id.* ¶ 104, but those dropped after Farooqi became AED, *see id.* ¶ 110.  Kazmi has remained a Level I pharmacist since he began at HHC in 1989.  *Id.* ¶ 105.  He has not received notice of available promotion opportunities or received a promotion, while younger, non-Pakistani pharmacists with less experience and expertise than he have been hired and promoted.  *Id.* ¶¶ 106–07.  He identifies two such promotions.  First, Kazmi points to the 2014 promotion of Gilles from Level I to Level III, *see id.* ¶ 107, the same promotion Hasan identified, *see id.* ¶ 99. *See id.* ¶ 107.  Second, Kazmi points to the 2017 promotion of Jihjun Yoon ("Yoon"), who was hired in 2015 as Level I pharmacist in the procurement department.  *See id.* ¶¶ 107, 192.  In 2017, Yoon was promoted to Level II infectious disease pharmacist without relevant experience. *Id.* ¶ 107.

To assist his wife, who is a kidney transplant recipient, since 1989 Kazmi has worked full time over three scheduled days per week.  *See id.* ¶ 108.  Kazmi alleges that after a late-2017 meeting with Farooqi and Nnoli, Farooqi and Nnoli changed his schedule to four days per week, including one double shift, "without legitimate purpose."  *Id.*  Kazmi pleads, "upon information and belief," that Farooqi and Nnoli did this with knowledge of his need to care for his wife.  *Id.*

9

f.    *Muhammed Rahman*

Muhammed Rahman ("Rahman"), age 70, is Pakistani-born and Sunni Muslim.  *Id.*

¶ 112.  Rahman received his medical degree in the Dominican Republic in 1989.  *Id.*  He has

worked for HHC since 2005, when he was hired as an intravenous chemotherapeutic pharmacist.

*Id.*  He is currently a Level II pharmacist.  *Id.*  As a Level II pharmacist, Rahman covers the main

pharmacy and occasionally the satellite pharmacy, IV room, and narcotic room.  *Id.* ¶ 113.

Rahman is responsible for filling prescriptions, maintaining patient and medical profiles,

consulting with physicians regarding patients, and supervising a pharmacy technician.  *Id.*

Rahman alleges that he has not received notice of promotion opportunities afforded to

younger, less qualified non-Pakistani pharmacists.  *Id.* ¶ 115.  However, he does not identify a

promotion that he was denied.

At an unspecified point in time, Rahman became the pharmacist with the most experience

in compounding chemotherapy medications, a task usually assigned to Level III pharmacists.  *Id.*

¶ 116.  Rahman was repeatedly asked to compound chemotherapy medications without being

promoted to Level III or receiving the corresponding pay.  *Id.*

Rahman further alleges that he was denied a religious accommodation.  In or about May

2019, Rahman was denied time off for Ramadan despite requesting such more than two weeks in

advance.  *Id.* ¶ 118.  "Upon information and belief," another pharmacist's request for time off in

the same period, not related to Ramadan, was approved.  *Id.* ¶ 119.

Rahman alleges that he "has been subjected to a hostile work environment," which has

exacerbated his heart condition.  *Id.* ¶¶ 120–21.  Rahman recalls one incident on December 14,

2018, when Farooqi asked him at the end of his shift to stay longer for an additional assignment,

which Rahman could not do because he is a caretaker of his chronically ill daughter.  *See id.*

¶ 122.  Despite, "upon information and belief," knowing about his daughter, Farooqi screamed at

him, threatened to call the police, and physically blocked him from exiting the pharmacy.  *Id.*
Farooqi also threatened to take "management action" against him.  *Id.*  Rahman was "shaken,
confused, and humiliated in front his colleagues," and submitted a complaint about the incident
to an H+H compliance officer, but never received a response.  *Id.* ¶¶ 123–24.

Farooqi also made unsafe requests of Rahman regarding the compounding of cytotoxic
medication.  *See id.* ¶ 125.  Rahman alleges that Farooqi asked him to prepare this medication in
a regular IV laminar flow hood, rather than a much safer chemotherapy hood designed with
ventilation.  *Id.*

g.      *Syed Raza*

Syed Raza ("Raza"), age 59, is Pakistani-born and Muslim.  *Id.* ¶ 126.  He has been a
full-time staff pharmacist at HHC since 2004.  *Id.*  He is currently a Level II pharmacist and an
acting supervisor.  *Id.*  As a Level II pharmacist, he "dispenses and processes a variety of
medication orders, reviews non-formulary medication orders, and arranges for availability of
life-saving medication in emergency situations."  *Id.* ¶ 127.

Raza alleges that he has not received notice of promotion opportunities afforded to
younger, less qualified non-Pakistani pharmacists.  *Id.* ¶¶ 129–30.  However, he does not identify
a promotion that he was denied.

In or about 2015, Raza was the IV room supervisor and worked closely with evening
pharmacy supervisor Ahmad.  *Id.* ¶ 131.  In a meeting with Farooqi, the two raised concerns
about understaffing and its effect on patient safety.  *Id.*  Farooqi criticized them for raising these
concerns and "engaged in discriminatory and retaliatory actions."  *Id.*  Farooqi transferred Raza
to the outpatient pharmacy.  *Id.*  ¶ 132.  Although she described this as a "rotation" that all
pharmacists would complete, Raza remained in the outpatient unit for approximately nine
months.  *Id.*  "Upon information and belief," younger, less experienced non-Pakistani

11

pharmacists were not required to complete a "rotation" in the outpatient pharmacy.  *Id.* ¶ 133.

When Raza requested that he be reassigned to the IV room, Farooqi "reprimanded him and

humiliated him in front of his colleagues."  *Id.* ¶ 134.  Raza was transferred back to the main

pharmacy but alleges that he now has the duties of a Level I pharmacist and is supervised by a

non-Pakistani Level II pharmacist.  *See id.* ¶ 135.  His responsibilities have been diminished, and

he is evaluated by a pharmacist on his own level, while others are evaluated by higher-level

supervisors.  *See id.* ¶ 136.

> h.   *Haider Syed*

Haider Syed ("Syed"), age 61, is Pakistani-born and Muslim.  *Id.* ¶ 137.  He holds a

master's degree of pharmacy, a Doctor of Medicine from the Dominican Republic, and has been

working as a registered pharmacist in the United States for approximately 29 years.  *Id.*  He

began working for HHC as a clinical pharmacist in 2003.  *Id.*  Approximately two years later, he

was promoted to supervisor of clinical services and named as medication safety officer.  *Id.*

Until February 25, 2019, he was a Level III clinical pharmacy supervisor and medication safety

officer.  *Id.*  He currently works in satellite pharmacies and code-cart areas.  *Id.*

Syed alleges that, in 2015, he was given a functional job description of "medication

safety officer."  *Id.* ¶ 139.  Between 2016 and 2019, he was not again given a functional job

description, despite requesting one.  *Id.*  In October 2019, he received such a description,

reading, "none."  *Id.*  Since Farooqi became AED, his evaluations have dropped from "above

satisfactory" to "satisfactory."  *Id.* ¶ 142.  Syed was informed by former Assistant Director

Joseph Tumino that "higher level management" requested that he lower Syed's rating.  *Id.* ¶ 143.

On information and belief, Syed alleges that Farooqi was that manager.  *Id.*

Syed alleges that he has been pressured to take on responsibilities outside his job.  *Id.*

¶ 140.  In or around September 2018, Syed's schedule was changed such that his "daily

responsibilities of generating interventions, clearing orders, preparing reports, and preparing profiles for rounds became more difficult to complete." *Id.* ¶ 141.  The Complaint does not reflect what these changes were or how they impacted his ability to complete his tasks.

Syed alleges that Farooqi has been "verbally demeaning, aggressive, and unprofessional" to him, causing a "hostile environment" that targets "older Pakistani" pharmacists.  *Id.* ¶ 145 (quoting Syed's internal complaint to H+H's EEO office).  When Syed prepared a presentation on medication safety, Farooqi mocked his spelling errors.  *Id.* ¶ 146.  In or about July 2018, Farooqi "raised her voice" and "insulted" Syed when he assisted with the preparation of a medication from the IV room.  *Id.* ¶ 147.  Syed alleges that she "engaged in an hour-long reprimand" and stated that she expected him to mix the medication by himself without assistance from the IV room.  *Id.*  In late September 2018, Syed alleges, Farooqi "raised her voice and insulted" him for not completing certain steps in communicating a medication recall, but took no action when she later learned that a non-Pakistani pharmacist was at fault.  *Id.* ¶ 148.

Syed further alleges that as a result of his January 2019 complaint to the H+H EEO, he experienced retaliation.  *See id.* ¶¶ 38, 150.  On February 5, 2019, Farooqi reassigned Syed from the clinical pharmacy to pharmacy procurement, a different practice area, with a "substantial qualitative reduction in professional responsibilities."  *Id.* ¶ 150.  Syed was directed to move from the clinical office to the purchasing office.  *Id.* ¶ 151.

Syed alleges that Farooqi and other supervisors continued to retaliate against him by adding responsibilities to his workload and those of other older Pakistani pharmacists.  *Id.* ¶ 155. Syed alleges that this created unreasonable expectations and greater stress on older Pakistani pharmacists.  *Id.* ¶ 156.  For example, with very little notice toward the end of his shift at 4 p.m., Go instructed Syed to lead the next shift's huddle, causing him to be late for a cardiac

appointment. *Id.* ¶¶ 152–53.  Marcia Russell, a non-Pakistani, was granted early leave for an emergency. *Id.* ¶ 153.  In or about early March 2019, Syed was tasked with conducting the daily Tour I huddle at 7:30 a.m. and the Tour II huddle at 4 p.m. *Id.* ¶ 154.  With little or no notice, Syed was required to assume the scheduling responsibilities of Nnoli, a supervisor, when she was absent or on vacation. *Id.* ¶ 157.  Go, on direction from Farooqi, also tasked him with attending OB-GYN meetings, executive huddles, staff meetings, and HIPAA rounds and performing clinical duties in addition to his procurement responsibilities. *Id.* ¶ 158.  Between April 2019 and June 2019, Syed was given the additional tasks of monitoring outstanding orders of other pharmacists, documenting refrigerator temperatures twice a day, including weekends, performing medication rounds for the entire hospital, leading medication delivery support for all floors of the hospital, and covering the main pharmacy and satellite pharmacies "as needed." *Id.* ¶¶ 159, 161. Syed alleges that, to complete these additional tasks, he was forced to come in earlier than his scheduled shift and was not compensated for these additional hours. *Id.* ¶ 162.

On June 18, 2019, Farooqi emailed Syed and directed him to move from the purchasing office to the stock room. *Id.* ¶ 160.  In or around July 2019, Farooqi directed Syed to vacate his pharmacy locker to make room for Tour I, although many other Tour II pharmacists were permitted to maintain their pharmacy lockers. *Id.* ¶ 163.

Syed is a cardiac patient. *Id.* ¶ 164.  He alleges that this retaliation caused him stress that impacted his health. *Id.*  On or around October 1, 2019, Syed asked Go if he could be relieved of his scheduler duties, which he contends were outside his job function, for health reasons, and Go referred him to the EEO office. *Id.* ¶¶ 165–66.  On or about October 10, 2019, Syed submitted a request for a reasonable accommodation with the H+H EEO office, and attached his physician's recommendation to be relieved of his duties as a pharmacy scheduler, to reduce stress. *Id.* ¶ 167.

14

On November 21, 2019, Nicole Phillips, EEO Regional Director, declined that request. *Id.* ¶ 168.  Instead, he alleges, he received yet more tasks: helping create a hazardous medications preparation protocol, ensuring staff completed certain training the same day, and investigating a delay in medication delivery and preparing a report before the end of the next day. *See id.* ¶¶ 170–72.  Syed believes these tasks were added to his work to cause him stress. *Id.* ¶ 173. Syed's schedule was also standardized as part of a purported effort to standardize pharmacist hours, but on information and belief, he alleges non-Pakistani pharmacists are still able to work outside of standard times. *Id.* ¶ 169.

On December 27, 2019, Syed suffered a cardiac event, which he attributes to the stress of the changes to his role and the hostile work environment. *Id.* ¶¶ 176, 178.  Syed alleges that Go prevented other pharmacy staff from visiting him and told one staff member "in sum and substance, that 'if these pharmacists are sick then why don't they retire.'" *Id.* ¶ 177.

On January 7, 2020, Syed met with Go and another Assistant Director, Jeh-Hing Lin ("Lin") who informed him that they were transferring him from purchasing to floor satellite pharmacies. *Id.* ¶ 179.  In a January 10, 2020 email, Lin informed Syed that he was being relieved of his supervisory duties as a Level III pharmacist. *Id.* ¶ 180.  Mina Eid, a younger, Non-Pakistani, Level I pharmacist, was continuing to perform Level III duties in the AICU, while Syed was now in the satellite pharmacy, generally a Level I responsibility. *Id.* ¶ 181.

On January 17, 2020, Syed was granted Family Medical Leave Act ("FMLA") leave. *Id.* ¶ 183.  He alleges that in connection with his application for leave, Farooqi's office improperly emailed his protected medical information to certain HHC directors. *See id.* ¶ 182.

### 3.   Discriminatory and Retaliatory Policies and Practices[4]

Plaintiffs allege that defendants have "engaged in discriminatory and retaliatory policies and practices adversely affecting older Pakistani pharmacists." *Id.* ¶ 184.

#### a.   Promotions

Plaintiffs allege that defendants engaged in discriminatory and retaliatory promotion policies and practices. *See id.* ¶¶ 185–92.  In addition to the allegations above, plaintiffs allege that Fakhrul Huda, a Pakistani pharmacist who is not a plaintiff in this case, has applied for a Level III position on at least two different occasions. *See id.* ¶ 190.  Although Huda has been employed at HHC for approximately 22 years and has expertise in intravenous medication, he has been denied promotions to Level III. *Id.*  One Level III position was given to Curtis Chin, who is much younger than Huda and has much less experience. *See id.* ¶ 191.  The position is the one that Abdullah alleges he was denied. *See id.* ¶ 71.

#### b.   Hiring and Forced Retirement

Plaintiffs allege that defendants engaged in discriminatory hiring practices and policies, including forced retirement. *See id.* ¶¶ 211–17.  Plaintiffs allege that on February 22, 2019, weeks after the internal EEO complaints were filed, non-plaintiff Zaman was "effectively forced

---

[4] Plaintiffs' allegations of alleged discriminatory and retaliatory policies and practices at HHC rely heavily on the allegations of two other Pakistani-born Muslim pharmacists, Fakrul Huda ("Huda") and Umer Farooq ("Farooq"), each of whom has filed a separate lawsuit in this District, as well as several other non-plaintiffs' experiences.  On August 25, 2020, Farooq's complaint was dismissed for failure to state a claim. *Farooq v. N.Y.C. Health & Hosps. Corp.*, No. 19 Civ. 6294 (JMF), 2020 WL 5018387, at *2 (S.D.N.Y. Aug. 25, 2020).  An appeal is pending. *See Farooq v. City of New York*, No. 20-3195 (2d Cir.).  On March 26, 2021, Huda's retaliation claims were sustained, but all other claims were dismissed. *See Huda v. N.Y.C. Health and Hosp.*, No. 19 Civ. 11556 (AJN), 2021 WL 1163975 (S.D.N.Y. Mar. 26, 2021).  The Court accepts as true all well-pled facts in the Complaint in this action.  The Court will take judicial notice of Huda's and Farooq's actions to establish the fact of those actions, but may not do so for the truth of the allegations asserted in their complaints. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

to retire" as a result of "Farooqi's repeated undermining of his responsibilities and position within the department."  *Id.* ¶ 211.  Farooqi allegedly "blocked" Zaman from performing his duties as supervising pharmacist of HHC, *id.* ¶ 212, and his responsibilities were given to lower-level pharmacists, *id.* ¶ 214.  Farooqi continued to hire and promote non-Pakistani pharmacists with far less experience without consulting Zaman, such as Sareen, an Indian male believed to be in his mid-30s without clinical experience; Michael Kaldas and Mina Eid, non-Pakistanis in their late 20s or early 30s; and Nnoli, a non-Pakistani who was promoted to the daytime pharmacy supervisor.  *Id.* ¶¶ 212–13.  In an email to the director of Human Resources on the day he retired, Zaman allegedly noted that he was disappointed that, as supervising pharmacist, he was unaware of promotions or hiring in the department.  *Id.* ¶ 215.

Since Farooqi became AED in 2014, five Pakistani pharmacists, including Zaman, "have left or were forced into retirement."  *Id.* ¶ 216.  As of the filing of the Complaint, out of 40 HHC pharmacists, 12 are Pakistani, 10 of whom have filed EEOC complaints.  *See id.* ¶ 217.  The Complaint does not reflect the ages, genders, or religions of the other two Pakistani pharmacists.

c.   *Hostile Work Environment*

Plaintiffs allege that defendants engaged in policies and practices that created a hostile work environment.  *See id.* ¶¶ 193–203.  In addition to the allegations above, plaintiffs allege that Zaman, the pharmacy's former Assistant Director, described Farooqi's tone as "often very threatening."  *Id.* ¶ 195.  Plaintiffs further allege that Farooq, a Pakistani pharmacist who filed a separate action, wrote in his internal EEO complaint that Farooqi "doesn't let people complete their sentences and insults" them.  *Id.* ¶ 196.  Many plaintiffs speak English as a second language and feel "bullied and intimidated" by Farooqi.  *Id.* ¶ 200.  When Farooq emailed Farooqi to complain of mistreatment by a non-Pakistani pharmacist, Farooqi "mocked Dr. Farooq's spelling errors."  *Id.* ¶ 201.  Farooqi also assigned Pakistani pharmacists higher workloads to intentionally

17

overburden them and, "upon information and belief," to force them to resign or retire.  *Id.* ¶ 202.

Finally, plaintiffs suggest that the disproportionately high workload contributed to the November

8, 2019 death of pharmacist Owais Qureshi, who experienced a "vascular event" while working

and died a few days later.  *Id.* ¶ 203; *see also id.* ¶¶ 174–75.

d.      *Lower Performance Evaluations*

Plaintiffs allege that defendants took steps resulting in lower performance evaluations for

plaintiffs and other older, Pakistani pharmacists.  *See id.* ¶¶ 204–10.  In addition to the

allegations above, plaintiffs allege that non-plaintiff Huda, who had previously received

"outstanding" ratings, saw his ratings drop to "satisfactory" in June 2018.  *Id.* ¶ 206.  Huda was

informed that higher level management had asked that his evaluation be lowered.  *Id.*  Non-

plaintiff Farooq, who had previously received "outstanding" ratings, saw his ratings drop to

"satisfactory" at the same time.  *Id.* ¶ 207.  Tumino, a former Assistant Director, informed

Farooq that higher level management had requested that he lower the evaluation to

"satisfactory."  *Id.* ¶ 208.

e.      *Retaliation*

Plaintiffs allege that Farooqi and Carrington have "created a de facto policy and practice

of punishing older Pakistani pharmacists who speak out against discrimination or patient care

issues."  *Id.* ¶ 218.  Ahmad, non-plaintiff Farooq, and non-plaintiff Huda have allegedly faced

"retaliatory disciplinary charges" as a result of their filing "internal and EEOC charges of

discrimination."  *Id.* ¶ 219.

In January 2019, Farooq made an internal complaint to H+H's EEO office alleging

discrimination.  *See id.* ¶ 222.  At an unspecified point between January 2019 and June 7, 2019,

Farooq notified his supervisors "concerning expired medication for intensive care unit patients."

*Id.*  On June 7, 2019, Farooq was given a written "counseling" notice for "unprofessional

18

communication to administration." He was directed to undergo counseling with Farooqi and Go; the counseling was later postponed to July. *Id.* ¶ 221. On June 21, 2019, Farooq was suspended from his position as a Level III clinical pharmacist and given a "pre-hearing suspension letter" dated June 21, 2019. *Id.* ¶ 222. The letter did not specify his alleged misconduct. *See id.* Farooq was suspended without pay and without opportunity to be heard. *Id.*

On July 27, 2019, about four weeks after filing EEOC charges, Huda was given a "counseling" notice for "Unprofessional Behavior" and received counseling on August 2, 2019. *Id.* ¶ 223. At the end of the counseling, Huda and his union representative were asked to sign a blank white piece of paper, which they refused to sign. *Id.* Huda was later suspended without pay and without notice or an opportunity to be heard. *Id.* ¶ 224.

### 4.    Administrative Remedies

In January 2019, seven "older Pakistani pharmacists" filed internal complaints with H+H's EEO office alleging discrimination based on, *inter alia*, race, color, national origin, religion, and age. *Id.* ¶ 38. The Complaint does not clarify if all seven complaining pharmacists are plaintiffs in this action. On April 30, 2019, plaintiffs' counsel sent a letter to CEO Carrington outlining plaintiffs' allegations. *Id.* ¶ 39. As of the filing of the Complaint, Carrington had not provided a response. *Id.* ¶ 40.

On June 21, 2019 (Ahmad) and July 1, 2019 (all other plaintiffs), plaintiffs filed charges with the EEOC alleging, race, color, national origin, religion and age discrimination and retaliation. *See id.* ¶¶ 5, 41. On November 8, 2019, the EEOC issued all eight plaintiffs Notices of Right to Sue. *See id.*

### B.    Procedural History of this Action

On January 24, 2020, plaintiffs filed the Complaint. Compl. On April 17, 2020, defendants moved to dismiss the Complaint. Dkts. 23, 24 ("Def. Mem."). On April 20, 2020,

the Court issued an order to plaintiffs to amend their Complaint or oppose the motion to dismiss. Dkt. 25.  On June 1, 2020, plaintiffs filed an opposition to the motion.  Dkt. 30 ("Pl. Opp'n"). On June 29, 2020, defendants filed their reply.  Dkt. 32 ("Reply").

## II.    Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.    Discussion

Plaintiffs bring 15 claims which, for clarity, the Court clusters as follows: (1) a § 1981 claim; (2) disparate treatment discrimination claims under federal and state law; (3) hostile work environment claims under federal and state law; (4) retaliation claims under federal and state law; (5) discrimination and retaliation claims under city law; (6) a § 1985 claim; (7) First Amendment retaliation claims; (8) *Monell* claims; and (9) claims under Article 1 of the New York State Constitution.

The Court addresses these categories in turn.

20

### A.      Claim Under § 1981

The Complaint brings a claim under § 1981 for discrimination based on race and

ethnicity.  Compl. ¶¶ 240–42.  However, it is well-established that § 1981 does not provide a

private right of action against state actors, and defendants are, undisputedly, state actors.  *See*

*Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) ("[T]he express cause of action for

damages created by § 1983 constitutes the *exclusive federal remedy* for violation of the rights

guaranteed in § 1981 by state governmental units." (emphasis in original) (quoting *Jett v. Dallas*

*Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)).  Plaintiffs concede that there is no private right of

action but argue that this claim should now be construed as a § 1983 claim.  *See* Pl. Opp'n at 23.

However, plaintiffs have separately brought *Monell* claims against H+H under § 1983, Compl.

¶¶ 243–63, and construing the § 1981 claim as a § 1983 claim makes it coextensive with those

*Monell* claims.  *See Jett*, 491 U.S. at 735–36 (to prevail on damages claim against state actor for

violation of rights protected by § 1981, plaintiff must show the violation was caused by a custom

or policy within the meaning of *Monell*).  Accordingly, the Court dismisses the § 1981 claim.

### B.      Federal and Parallel State-Law Discrimination Claims

#### 1.      Claims Against Individual Defendants Under Title VII and ADEA

Title VII and the ADEA do not provide for individual liability.  *See Tomka v. Seiler*

*Corp.*, 66 F.3d 1295, 1313–14 (2d Cir. 1995) (Title VII); *Cherry v. Toussaint*, 50 F. App'x 476,

477 (2d Cir. 2002) (ADEA).  Accordingly, the Court dismisses all Title VII and ADEA claims

brought against the individual defendants, Carrington and Farooqi.

#### 2.      Age Discrimination Claims

The Complaint has not adequately pled any freestanding discrimination claims based on

age.  As formulated, the Complaint does not allege that there is general age discrimination in the

HHC pharmacies.  Rather, plaintiffs' allegations are that there has been discriminatory treatment

21

of Pakistani-born, Muslim pharmacists, and that within that group, the discrimination has fallen

on persons over age 40, who, as pled, make up at least 10 of the 12 Pakistani pharmacists. *See*

Compl. ¶ 217. However, the Complaint does not allege any facts on which one can infer that any

alleged disparate treatment or harassment has been motivated by age, as opposed to plaintiffs'

other protected characteristics. Accordingly, the Court grants defendants' motion to dismiss as

to all claims, including those under the ADEA, alleging discrimination on the basis of age.

### 3. Disparate Treatment Claims

Plaintiffs bring discrimination claims under Title VII, the NYSHRL, and § 1983 alleging

disparate treatment based on race, ethnicity, national origin, and religion.

#### a. *Legal Principles*

##### i. Employer Liability

Disparate treatment claims under Title VII, the NYSHRL,[5] and § 1983 are all analyzed

under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973). *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (Title VII and NYSHRL); *Annis*

*v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998) (§ 1983). Under it, the plaintiff bears

the initial burden of establishing a *prima facie* case of discrimination. *See Holcomb v. Iona*

*Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). To do so, the plaintiff must show that "(1) he belonged

to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse

---

[5] In August 2019, the NYSHRL was amended to broaden its liability standards. *See* N.Y. Exec.
Law § 300. The vast majority of the conduct alleged here, however, pre-dates the amendment,
which does not have retroactive effect. *See McHenry v. Fox News Network, LLC*, No. 19 Civ.
11294 (PAE), --- F. Supp. 3d ---, 2020 WL 7480622, at *8 (S.D.N.Y. Dec. 18, 2020). Ahmad
and Syed do allege discriminatory or retaliatory conduct after the amendments took effect. *See*
Compl. ¶¶ 60, 169, 179–80. The Court does not have occasion to consider the consequence of
any conduct that straddles the amendment's effective date, however, because, for the reasons that
follow, Ahmad and Syed have stated claims under the more rigorous pre-amendment standard.
*See infra* pp. 52–56.

employment action; and (4) the adverse employment action occurred under circumstances giving

rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150

(2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138).  The burden of establishing a *prima facie*

case in an employment-discrimination case is "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509

U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

However, at the motion to dismiss stage, a plaintiff "is not required to plead a *prima facie*

case under *McDonnell Douglas*."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84

(2d Cir. 2015); *see also Forkin v. Local 804 Union (IBT)*, 394 F. Supp. 3d 287, 307 (E.D.N.Y.

2019) ("At the pleading stage, . . . a plaintiff need not prove discrimination or even allege facts

establishing every element of the *McDonnell Douglas prima facie* case.").  Instead, "[t]he facts

alleged must give plausible support to the reduced requirements that arise under *McDonnell

Douglas* in the initial phase of a Title VII litigation." *Littlejohn v. City of New York*, 795 F.3d

297, 311 (2d Cir. 2015).

For employment discrimination claims under Title VII and the NYSHRL, a plaintiff must

"plausibly allege that (1) the employer took adverse action against him and (2) his race, color,

religion, sex, or national origin was a motivating factor in the employment decision." *Vega*,

801 F.3d at 86; *see Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 51 (S.D.N.Y. 2019).

For claims under § 1983, "[o]nce the color of law requirement is met, a plaintiff's equal

protection claim parallels his Title VII claim."  *Vega*, 801 F.3d at 88 (quotations and citation

omitted).  Here, defendants do not dispute that the color of law requirement has been met.

Beyond that, a plaintiff may satisfy this pleading standard by "alleging facts that directly show

discrimination or facts that indirectly show discrimination by giving rise to a plausible inference

of discrimination." *Id.* at 87.  In short, the complaint must plead facts that provide "at least

minimal support for the proposition that the employer was motivated by discriminatory intent."
*Littlejohn*, 795 F.3d at 311.

ii. Individual and Aider-and-Abettor Liability

Title VII does not provide for individual liability, *see Tomka*, 66 F.3d at 1313–14, but
§ 1983 and the NYSHRL do.

To state a claim under § 1983 against individuals, a "plaintiff must allege sufficient facts
to demonstrate the defendants were personally or directly involved in the violation, that is, that
there was 'personal participation by one who ha[d] knowledge of the facts that rendered the
conduct illegal.'" *Harris v. Westchester Cnty. Dep't of Corr.*, No. 06 Civ. 2011, 2008 WL
953616, at *9 (S.D.N.Y. April 2, 2008) (alteration in original) (quoting *Provost v. City of
Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)).  An official's personal involvement may be shown
by evidence that he:

> (1) participated directly in the alleged constitutional violation; (2) failed to remedy
> the wrong after being informed of the violation through a report or appeal;
> (3) created a policy or custom under which unconstitutional practices occurred, or
> allowed the continuance of such a policy or custom; (4) was grossly negligent in
> supervising subordinates who committed the wrongful acts; or (5) exhibited
> deliberate indifference by failing to act on information indicating that
> unconstitutional acts were occurring.

*Morgan v. Ward*, No. 14 Civ. 7921 (GHW), 2016 WL 427913, at *6 (S.D.N.Y. Feb. 2, 2016).

"The NYSHRL [also] allows for individual liability."  *Xiang v. Eagle Enters., LLC*,
No. 19 Civ. 1752 (PAE), 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020).  There are two
available theories of liability: where the individual defendant is considered an "employer," N.Y.
Exec. Law § 296(1), or aided and abetted the unlawful discriminatory acts of others, *id.* § 296(6);
*see Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521–22 (S.D.N.Y. 2015).  An individual
defendant is liable as an "employer" under § 296(1) "when that individual has an ownership
interest in the relevant organization or the power to do more than carry out personnel decisions

24

made by others," *i.e.*, the power to hire or fire. *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (emphasis added) (internal quotations and citation omitted). "A supervisor is an 'employer' for purposes of establishing liability under the NYSHRL if that supervisor actually participates in the conduct giving rise to the discrimination." *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (cleaned up) (quoting *Tomka*, 66 F.3d at 1317).

Aiding-and-abetting liability is available under the NYSHRL, provided that the principal—the employer—has been found liable for discriminatory conduct. *Xiang*, 2020 WL 248941, at *5. To make out an aiding and abetting claim, a plaintiff must allege that "[defendant] 'actually participate[d] in the conduct giving rise to a discrimination claim.'" *Id.* (quoting *Feingold*, 366 F.3d at 158). The Second Circuit has held that "a co-worker who actually participates in the conduct giving rise to a discrimination claim [can] be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold*, 366 F.3d at 158 (internal quotation marks and citation omitted). "This extends to personal liability 'for aiding and abetting allegedly unlawful discrimination by [an] employer even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability,' so long as the employer's conduct has also been found to be discriminatory under the NYSHRL." *Xiang*, 2020 WL 248941, at *5 (alteration in original) (quoting *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012)); *see also, e.g.*, *Ulrich v. Soft Drink, Brewery Workers & Delivery Emps.*, 425 F. Supp. 3d 234, 244 n.10 (S.D.N.Y. 2019) (recognizing that *Tomka*, 66 F.3d 1295, which announced the above principle, creates "a strange and confusing circularity," but stating that the law of the Circuit "seems clear" (citation omitted)); *Tully-Boone v. N. Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008) ("The Court is mindful that the *Tomka* interpretation of § 296(6) is not

without controversy.  Nevertheless, until the Second Circuit revisits the issue, *Tomka* is the law in this Circuit." (quotation marks and citation omitted)).

> ### b.  Application

Defendants do not contest that each plaintiff is a member of a protected class—indeed, multiple such classes (nationality, religion, and for some, age).  The Court accordingly examines, for each of the eight plaintiffs separately, their claim of disparate treatment on account of such characteristics.[6]  Each must plausibly allege that he or she suffered an adverse employment action motivated by discriminatory animus.

> #### i.  Abdullah's Failure-to-Promote Claims

Abdullah is a Level II pharmacist who was apparently promoted from his Level I position after Farooqi became AED.  *See* Compl. ¶¶ 29 (Farooqi became AED in or around 2014), 66 (Abdullah was promoted to Level II on January 15, 2015).  Abdullah brings three failure-to-promote claims relating to three Level III positions.  The first is an August 2016 Level III position, which was posted on the H+H website.  *See id.* ¶ 68.  Abdullah applied but was not selected.  *Id.*  The second is an August 2018 unposted Level III position that was awarded to Curtis Chin, a non-Pakistani pharmacist in his mid-30s who began working at HHC in November 2010 as a Level I pharmacist.  *Id.* ¶ 71.  The third is a December 2018 unposted Level III position that was awarded to Sareen, a non-Pakistani pharmacist also in his mid-30s who was hired directly as a Level III clinical pharmacist despite having limited or no clinical experience as a hospital or clinical pharmacist.  *Id.* ¶ 72.  Abdullah does not specifically plead that he was

---

[6] Plaintiffs argue that they have also alleged a "pattern and practice of discrimination."  Pl. Opp'n at 17.  Although such a pattern and practice may be "highly relevant to an individual disparate treatment . . . claim," private, non-class plaintiffs such as those here may not use the pattern-and-practice "method of proof as an independent and distinct method of establishing liability."  *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012).

26

qualified, but he pleads that he had "nine years of distinguished service with HHC and excellent recommendations," *id.* ¶ 68, and defendants do not dispute that he was qualified for a Level III position, *see* Def. Mem. at 10–11.

Abdullah's failure-to-promote claim regarding the August 2016 position is untimely under all statutes.  *See* 42 U.S.C. § 2000e-5(e)(1) (plaintiff has 300 days from alleged discriminatory conduct to file EEOC charge); N.Y. C.P.L.R. 214(2) (statute of limitation under NYSHRL is three years); *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("The statute of limitations applicable to claims brought under . . . [§] 1983 in New York is three years.").

However, Abdullah's allegation as to this post assists him as to the later promotions, insofar as it supports a reasonable inference that he expressed his interest in a Level III position to H+H.  That is because a plaintiff need not plead that he applied for a position where, as here, "the plaintiff indicated to the employer an interest in being promoted to a particular class of positions, but was unaware of specific available positions because the employer never posted them."  *Mauro v. S. New Eng. Telecomms., Inc.*, 208 F.3d 384, 387 (2d Cir. 2000) ("In such a situation, requiring the plaintiff to show that he or she applied for the specific jobs at issue would be unrealistic, as an employee by definition cannot apply for a job that he or she does not know exists.").[7]  Here, Abdullah alleges that he was not selected for either unposted 2018 position and that two non-Pakistani pharmacists were selected instead.  Viewed in light of Abdullah's other

---

[7] H+H's argument to the contrary, Def. Mem. at 11, is refuted by the case law.

allegations, that is sufficient to meet the pleading standards for a failure-to-promote claim based on race, ethnicity, color, and national origin.[8]

However, Abdullah's claims with respect to the August 2018 position are timely only under § 1983 and the NYSHRL.[9]  Plaintiffs contend that Abdullah's Title VII claims as to this promotion are not time-barred under the continuing-violation doctrine.  *See* Pl. Opp'n at 23–24. But courts in this Circuit "have consistently held that discrete or completed acts, including repeated failures to promote an employee, do not constitute a continuing violation."  *Aggarwal v. N.Y.C. Health & Hosp. Corp.*, No. 98 Civ. 5063 (DLC), 2000 WL 172787, at *4 (S.D.N.Y. Feb. 10, 2000).  To be sure, in distinct circumstances, courts have applied the continuing-violation doctrine to failure-to-promote claims where the plaintiff alleges that the employer failed to promote an employee pursuant to an "ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests."  *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999) (citation omitted).  But the Complaint has not plausibly pled such a policy.  Plaintiffs conclusorily state that failure to promote Abdullah was part of general "ongoing and continuing discrimination," but they do not identify any allegations that concretely identify a discriminatory policy or practice governing pharmacist promotions.  *See* Pl. Opp'n at 18, 23–24.  And Abdullah himself was promoted from Level I to Level II, under Farooqi, in 2015.  *See* Compl. ¶ 66.  Accordingly, Abdullah's failure-to-promote claim under Title VII is time-barred with respect to the August 2018 position.

---

[8] Abdullah does not make any allegations that permit an inference that the failure to promote him reflected religious discrimination.

[9] Abdullah filed his EEOC charge on July 1, 2019.  Compl. ¶ 5.  Accordingly, absent a continuing violation, claims based on events occurring prior to September 4, 2018 are untimely under Title VII.

As to individual and aider-and-abettor liability, the Complaint does not specifically allege that Farooqi actually participated in the promotions of Chin and Sareen over Abdullah.  But it does allege that, along with her direct reports, Farooqi was heavily involved in staffing decisions, scheduling, performance evaluations, and day-to-day operations of the pharmacy.  *See, e.g.*, Compl. ¶¶ 45, 51–55, 58, 65, 75, 122, 125, 131–34, 147–48, 150, 160.  That sufficiently permits an inference that she participated in selecting candidates for promotion.  At a minimum, based on the Complaint, Farooqi would have been aware of who was being promoted in the pharmacy department.  *See Ananiadis v. Mediterranean Gyros Prod., Inc.*, 151 A.D.3d 915, 918 (2d Dep't 2017) (supervisor who knows of discriminatory conduct and fails to investigate or take remedial measures participates for purposes of the NYSHRL).  And defendants do not contest that the Complaint alleges that Farooqi actually participated in the decision not to promote Abdullah. They argue that the aider-and-abettor claims must be dismissed because a person cannot aid and abet one's own unlawful conduct.  *See* Def. Reply at 5.  But, as explained *supra* pp. 25–26, in this Circuit, where an employer is found liable for discrimination, an individual can be held liable for aiding and abetting allegedly unlawful discrimination by the employer, even where the individual's actions serve as the predicate for the employer's liability.  *See Xiang*, 2020 WL 248941, at *5.  To be sure, as defendants note, Farooqi cannot be held individually liable as both an "employer" *and* an "aider-and-abettor" of the same conduct.  *See* Def. Reply at 5.  But as plaintiffs have adequately pled Farooqi's personal involvement, the Court defers until after discovery the question of whether Farooqi may be individually liable as an "employer" or an "aider and abettor."  Accordingly, the Court sustains Abdullah's individual claims against Farooqi under § 1983, and his individual and aider-and-abettor claims against Farooqi under the NYSHRL.

The Complaint is devoid, however, of allegations that Carrington had knowledge of either of these promotions, let alone actually participated in them. The Court accordingly dismisses Abdullah's claims against Carrington under § 1983 and the NYSHRL.

ii.     Kazmi's Failure-to-Promote Claims

Kazmi has worked as a Level I pharmacist at HHC since 1989. Compl. ¶ 105. He alleges that he did not receive notice of Level II promotional opportunities and that these posts were given to younger, non-Pakistani pharmacists with less experience and expertise than he has. *Id.* ¶¶ 106–07. Kazmi identifies two positions: (1) the 2014 promotion of Gilles, a younger and less-experienced Level I pharmacist, directly to Level III; and (2) the 2017 promotion of Yoon, hired in 2015 as Level I pharmacist, to Level II infectious disease pharmacist. *See id.* ¶¶ 107, 192.

Kazmi's claims as to the 2014 position are untimely, because the position was filled long—well more than 300 days—before Kazmi filed his EEOC charge on July 1, 2019, Compl. ¶ 5, and well more than three years before the filing of this lawsuit. His claims arising from the 2017 promotion of Yoon, which occurred "in or around Spring 2017," *id.* ¶ 192, would be timely under §1983 and the NYSHRL. Kazmi alleges that Yoon, a Level I pharmacist in the procurement department, was promoted to Level II infectious disease pharmacist, despite not having relevant experience, while he, with experience in all pharmacy areas, was passed over. *See id.* ¶¶ 103–07. In light of Kazmi's other allegations, the promotion over him of two allegedly less-qualified non-Pakistanis supplies an inference of discrimination.

However, Kazmi does not allege that he ever expressed an interest in a Level II promotion to any of his supervisors. At the pleading stage, "[w]hen an applicant is unaware of open positions because an employer does not post vacancies, it is sufficient for a plaintiff to express interest in a particular class of positions," as opposed to a particular position. *Wang v. Phoenix Satellite Television US, Inc.*, 976 F. Supp. 2d 527, 538 (S.D.N.Y. 2013). This appears

30

to be an inadvertent omission rather than a fatal deficiency in Kazmi's claim.  *See* Compl. ¶ 111 (2019 internal EEO complaint expressing that Kazmi hopes H+H "will address [his] concerns and help [him] in getting justice with [a] promotion . . . after 30 years of service").  In granting the motion to dismiss as to this specific claim, the Court does so without prejudice to Kazmi's right, promptly, to move for leave to amend this claim.

### iii.    Ahmed's Discriminatory Discipline Claims

The Complaint alleges that in April 2018, Ahmed received a five-day suspension for not wearing gloves while fulfilling an emergency medication request.[10]  *See* Compl. ¶ 91.  A suspension can qualify as an adverse employment action.  *See, e.g.*, *Witek v. City of New York*, 807 F. App'x 52, 54 (2d Cir. 2020) (summary order).  Although Ahmed does not identify a similarly situated individual who was not suspended for the same behavior, he pleads circumstances from which an inference arises that the suspension was motivated by discrimination.  Ahmed pleads that it is not against H+H policy to not wear gloves while fulfilling emergency requests.  Compl. ¶ 91.  And he alleges that Ahmad, his immediate supervisor and an eyewitness, was not allowed to participate in Ahmed's review, also in violation of H+H policies and procedures.  *Id.*

Because it occurred in April 2018, more than 300 days before Ahmed filed his EEOC charge, Ahmed's claim is not timely under Title VII.  But it is timely under § 1983 and the NYSHRL, which have a three-year statute of limitations.

As to individual and aider-and-abettor liability, the Complaint alleges that, in addition to her role in the staffing and operations of the HHC pharmacy, Farooqi personally participated in

---

[10] Although Ahmed characterizes this as a "retaliatory" act, the Complaint does not plead that Ahmed had engaged in any protected activity that led to his disciplinary review and suspension. Accordingly, the Court treats this allegation as a disparate treatment claim.

"counseling" pharmacists, *see id.* ¶ 221, and has the ability to take "management action" against individual pharmacists, *id.* ¶ 122.  These allegations make reasonable the inference that Farooqi participates in disciplining pharmacists.  They support, at a minimum, that Farooqi would at least be aware of disciplinary actions against pharmacists.  *Ananiadis*, 151 A.D.3d at 918.  And defendants do not argue that the individual claims against Farooqi should be dismissed for lack of actual participation.  *See* Def. Reply at 5.  Accordingly, the Court sustains the individual claims under § 1983 and the individual and aider-and-abettor claims against Farooqi under the NYSHRL.

The claims against Carrington, however, again fail.  There are no allegations supporting that Carrington participated in or had any knowledge of the disciplinary review or suspension.  Accordingly, the Court dismisses all claims against Carrington related to Ahmed's suspension.

### iv.  Raza's Diminution of Duties Claim

Raza, a Level II pharmacist, alleges that in 2015, after complaining to Farooqi about understaffing on his Tour, he was transferred from the IV room to the outpatient pharmacy.  Compl. ¶ 132.  Although Farooqi touted a "rotation" that all pharmacists would complete, "upon information and belief," younger, non-Pakistani pharmacists were not required to complete a "rotation" in the outpatient pharmacy, whereas Raza remained in the outpatient pharmacy for approximately nine months.  *Id.* ¶¶ 132–33.  When Raza requested that he be assigned back to the IV room, Farooqi "reprimanded him and humiliated him in front of his colleagues." *Id.* ¶ 134.  And, since being returned the main pharmacy, Raza alleges, he now has the duties of a Level I pharmacist and is supervised by a non-Pakistani Level II pharmacist.  *See id.* ¶ 135.  His responsibilities have been diminished, and he is evaluated by a peer pharmacist, while others are evaluated by higher-level supervisors.  *See id.* ¶ 136.

Raza's claim based on the 2015 "rotation" is untimely.  In any event, "courts in this circuit have regularly held that temporary reassignments which do not impact an employee's salary or benefits do not constitute an adverse employment action."  *Freeman v. Dep't of Env't Prot.*, No. 10 Civ. 1555 (NGG) (LB), 2013 WL 817221, at *5 (E.D.N.Y. Feb. 5, 2013) (collecting cases), *report and recommendation adopted*, 2013 WL 801684 (E.D.N.Y. Mar. 5, 2013).

However, Raza alleges that since he was transferred back to the main pharmacy, he continues to have the duties of effectively a Level I pharmacist.  "[S]ignificantly diminished material responsibilities" can constitute a materially adverse change to the conditions of one's employment.  *Zoulas*, 400 F. Supp. 3d at 53.  Further supporting his claim of a *de facto* demotion to a Level I pharmacist is the allegation that Raza, a Level II pharmacist, is now evaluated by another Level II pharmacist, while others are evaluated by higher-level individuals.  Although this action is facially neutral, Raza alleges that although he was told all pharmacists would go through this rotation, he is unaware of any non-Pakistani pharmacists who have been assigned this "rotation."  These allegations, viewed in the totality of the circumstances, provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent."  *Id.* at 51.

As to individual liability, the Complaint alleges that Farooqi participated in the transfer and the transfer back (as Raza had to request reassignment from Farooqi).  Compl. ¶¶ 132, 134.  Accordingly, the Court sustains the claims under § 1983 and under the NYSHRL, including for aiding and abetting, against Farooqi.  But the Complaint is devoid of allegations that Carrington participated in or had any knowledge of Raza's transfers and diminution of duties.  Accordingly, all claims against Carrington related to this conduct are dismissed.

v.      Other Allegations

The vast majority of plaintiffs' other allegations are insufficient to state a disparate treatment claim because they do not constitute adverse actions.  Plaintiffs argue that taking into account the sum total circumstances, they have each pled an "atmosphere" of adverse actions. *See* Pl. Opp'n at 15.  But as defendants note, the cases to which plaintiffs cite are *retaliation* cases.  *See Phillips v. Bowen*, 278 F.3d 103 (2d Cir. 2002); *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir. 1997).  Courts in this Circuit have recognized that the "standard for a retaliation claim, however, is a lower standard for adverse action as compared to a discrimination claim."  *Carpenter v. City of Mount Vernon*, 198 F. Supp. 3d 272, 282 (S.D.N.Y. 2016); *see also Kennedy v. Bernhardt*, No. 18 Civ. 647 (JLS), 2020 WL 7399050, at *7 (W.D.N.Y. Dec. 16, 2020) (collecting cases) ("As other courts in this circuit have noted, the standard for establishing an adverse action in a First Amendment retaliation claim is 'more inclusive than the standard of materially adverse change in the terms and conditions of employment which is required in Title VII discrimination claims.'" (quoting *Esar v. JP Morgan Chase Bank N.A.*, No. 15 Civ. 382 (NGG) (PK), 2018 WL 2075421, at *7 (E.D.N.Y. May 3, 2018))).  Accordingly, courts in this Circuit have declined to apply this lower standard for adverse actions to disparate treatment claims.  *See, e.g.*, *Carpenter*, 198 F. Supp. 3d at 282; *Kaur v. N.Y.C. Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("It should also be noted that there is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiff's discrimination claim."); *Figueroa v. N.Y. Health & Hosps. Corp.*, 500 F. Supp. 2d 224, 230 (S.D.N.Y. 2007); *Kennedy*, 2020 WL 7399050, at *8 (W.D.N.Y. Dec. 16, 2020); *Esar*, 2018 WL 2075421, at *7 (E.D.N.Y. May 3, 2018).  To sustain their disparate treatment claims, plaintiff thus may not rely on the "atmosphere" of individually insufficient adverse actions.

*Failure to Promote*: Ahmed, Hasan, Rahman, and Raza each bring failure-to-promote claims.  *See* Compl. ¶¶ 88 (Ahmed), 97–99 (Hasan), 115 (Rahman), 129–30 (Raza).  Ahmed, Rahman, and Raza conclusorily allege that they were not notified of promotions and did not receive promotions.  *See id.* ¶¶ 88, 115, 129–30.  These allegations are insufficient.  In contrast to Abdullah's well-pled failure-to-promote claims, Ahmed, Rahman, and Raza do not identify any specific promotion that they applied for and did not receive, or any promotion that they were not notified of and which was awarded to another pharmacist.  *See Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 229 (E.D.N.Y. 2016) (allegations that plaintiff was "prevented from obtaining unspecified promotions or other employment opportunities" that were "lacking in any supporting factual detail . . . are insufficient to satisfy [plaintiff's] pleading burden).  Nor do they allege that they expressed interest in a promotion.

Hasan alleges that he was eligible and qualified for the 2014 promotion to Level III that was instead awarded to Gilles, a non-Pakistani Level I pharmacist.  Compl. ¶ 99.  However, this promotion occurred in 2014.  This claim is therefore untimely.

*Lower Performance Evaluations*: Each plaintiff pleads that since Farooqi became AED, they have received lower performance evaluations.  *See id.* ¶¶ 58–59 (Ahmad), 77 (Abdullah), 89 (Ahmed), 97 (Hasan), 110 (Kazmi), 114 (Rahman), 128 (Raza), 142–43 (Syed).  Ahmad and Syed allege that Farooqi instructed their supervisor to lower their evaluations.  *See id.* ¶¶ 58–59 (Ahmad), 143 (Syed).  Ahmad pleads that his former supervisor, Zaman, refused to do so, calling it an "injustice."  *Id.* ¶ 59.

"Negative performance evaluations qualify as adverse employment actions only if they are accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss."  *Smith v. City of New York*, 385 F. Supp. 3d 323, 334 (S.D.N.Y. 2019) (cleaned

up).  But the Complaint does not plead that any plaintiff even received a *negative* evaluation.

Ahmad, Abdullah, Ahmed, Kazmi, and Syed allege that they received "satisfactory" ratings. *See*

Compl. ¶¶ 58, 77, 89, 142.  Hasan, Kazmi, Rahman, and Raza do not specify what performance

rating they received. *See id.* ¶¶ 97, 110, 114, 128; *Farooq*, 2020 WL 5018387, at *7 ("Farooq's

satisfactory performance evaluation, without more, does not qualify as a materially adverse

employment action."); *see also Moy v. Perez*, 712 F. App'x 38, 41 (2d Cir. 2017) (summary

order) ("Given that [plaintiff's] performance evaluation was still positive (albeit less positive

than in previous years), neither the evaluation nor the circumstances surrounding its issuance

plausibly make out an adverse employment action.").  And even assuming that the satisfactory

ratings constituted "negative" ratings, the Complaint is devoid of allegations that any of the

plaintiffs suffered any negative consequences as a result of the lowered performance evaluations.

   ***Denial of Religious Accommodation***: Only one plaintiff, Rahman, alleges that he was

denied a religious accommodation.  *See* Compl. ¶¶ 118–19.  He alleges that despite giving well

more than the required two weeks' notice, he was denied time off for Ramadan, while another

unnamed pharmacist was given time off in the same period for an unrelated purpose.  *See id.*

   To make out a *prima facie* case of religious discrimination, plaintiffs "must show (1) they

held a bona fide religious belief conflicting with an employment requirement; (2) they informed

their employers of this belief; and (3) they were disciplined for failure to comply with the

conflicting employment requirement."  *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167

(2d Cir. 2001).  Threats of discipline are sufficient to satisfy the third factor.  *See Gueye v.*

*Evans*, No. 04 Civ. 6029 (SHS), 2006 WL 3298427, at *6 (S.D.N.Y. Nov. 13, 2006), *aff'd sub*

*nom. Gueye v. Gutierrez*, 277 F. App'x 70 (2d Cir. 2008) (summary order).

"Courts in this district and elsewhere have repeatedly held that an individual must have suffered some type of discipline or demotion—or at least the threat of discipline or demotion—in order to establish a prima facie case of religious discrimination pursuant to Title VII." *Id.* (collecting cases); *see also Mines v. City of New York/DHS*, No. 11 Civ. 7886 (JGK), 2013 WL 5904067, at *8 (S.D.N.Y. Nov. 4, 2013) (plaintiff must show that he was "'threatened with discipline' or suffered some 'adverse employment action' for failing to report to work on the days she requested to take off for religious accommodation" (quoting *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 370 (S.D.N.Y. 2008))).  The Complaint does not allege that Rahman was threatened with discipline or disciplined for failing to work on Ramadan.  And a court "cannot infer that discipline would have resulted if Plaintiff had in fact not reported for work on the days he requested."  *Siddiqi*, 572 F. Supp. 2d at 370.

A plaintiff can state a different type of claim for religious discrimination under Title VII: "a claim that defendant refuses to give Muslims time off to observe their religious holidays but does give time off to adherents of other religions."  *Id.* at 371.  But the Complaint does not allege any facts suggesting that pharmacists of other religions were given religious holidays off while Rahman was not.  It only pleads that another pharmacist was given the day off on the day which Rahman had requested off, but not to observe a different religion.  Accordingly, Rahman has not stated a claim for religious discrimination.

***Undesirable Shifts and Changes to Shifts***: Abdullah, Kazmi, and Syed allege that they suffered adverse employment actions in the form of shift changes or undesirable shift assignments.[11]  Compl. ¶¶ 75–76 (Abdullah), 107–08 (Kazmi), 141, 169 (Syed).  Abdullah and

---

[11] Plaintiffs argue that Rahman also suffered undesirable shift changes as a result of different work assignments.  The Court addresses these allegations *infra*, in discussing changes to the

Syed allege that they were made to conform to the standardized shifts, while non-Pakistani pharmacists were permitted more flexibility. *See id.* ¶¶ 75, 169.

"Typically, lateral transfers or shift changes without a loss of pay or other material changes in working conditions do not constitute an adverse employment action." *Booker v. Fed. Rsrv. Bank of N.Y.*, No. 01 Civ. 2290 (DC), 2003 WL 1213148, at *11 (S.D.N.Y. Mar. 17, 2003); *see also Johnson v. Eastchester Union Free Sch. Dist.*, 211 F. Supp. 2d 514, 518 (S.D.N.Y. 2002) (schedule change to "very inconvenient" hours did not amount to an adverse action). Accordingly, allegations based on the flexibility of hours do not plausibly allege an adverse employment action.

The Complaint alleges that Abdullah accepted the Level II position with the condition of a four-day per-week schedule, but that in 2015, Farooqi changed his shifts abruptly despite knowing that Abdullah had already booked his travel from Buffalo in advance. *See* Compl. ¶¶ 65–66, 76. In certain circumstances, schedule changes can be so adverse as to rise to the level of an adverse action, such as where the "shift assignment that makes [] normal life difficult for the employee." *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002). Abdullah's allegations, however, do not rise to this level. And even if they did, any claim based on Abdullah's shift change is untimely, as Farooqi changed his schedule on June 1, 2015.

Kazmi's claims present a closer call. Kazmi's wife is a kidney transplant recipient, and to care for her, since 1989, he has worked a full-time schedule of three days per week. *See* Compl. ¶ 108. Kazmi alleges that near the end of 2017, Farooqi or Nnoli changed his schedule to four days a week, including one double shift, "without legitimate purpose," "despite, upon

---

pharmacists' respective duties.

information and belief, their awareness of Kazmi's need to have days on which to take care of his wife." *Id.* Courts in this Circuit have held that, on a case-by-case basis, where a shift change interferes with a parent's ability to spend time with and care for a child, the shift change may constitute an adverse action. *See, e.g.*, *Velazquez v. City of New York*, No. 16 Civ. 9606 (ALC), 2017 WL 6948357, at *4 (S.D.N.Y. Dec. 13, 2017); *Forsythe v. N.Y.C. Dep't of Citywide Admin. Servs.*, 733 F. Supp. 2d 392, 400 (S.D.N.Y. 2010), *aff'd*, 428 F. App'x 40 (2d Cir. 2011) (summary order). While the case law does not contain cases extending this doctrine to care for spouses, the Court regards the precedents as to care for children as persuasive. On the pleadings, the Court accordingly upholds Kazmi's claim that his shift change was an adverse action. Although the Complaint pleads that either Farooqi or Nnoli (who reports to Farooqi) initiated the change, it does not allege that Carrington played any part in or had knowledge of the shift change. Accordingly, the individual and aiding-and-abetting claims against Carrington are dismissed. Abdullah's and Syed's claims based on shift changes, however, are not cognizable.

**Changes to Duties**: Ahmad, Abdullah, Rahman, and Syed allege that they experienced changes to their duties that constituted adverse employment actions.

Ahmad alleges that since becoming AED, Farooqi has reduced his "supervisory responsibilities and his institutional prominence" at HHC. Compl. ¶ 45. But the examples that Ahmad provides do not amount to an actionable reduction in his supervisory responsibilities. That Ahmad was not included in the incoming residents' orientation booklet, *see id.* ¶ 46, is insufficient. *See Brown*, 673 F.3d at 150 ("mere inconvenience[s]" are not adverse employment actions (citation omitted)). And the 2018 removal of his duty to complete evaluations of the pharmacists he supervises, *see* Compl. ¶ 57, is a single instance in which his responsibilities were altered. It is not a material change to the terms of his employment. *See Brown*, 673 F.3d

at 150 ("alteration of job responsibilities" not an adverse action (citation omitted)). Ahmad does not even plead that he was stripped of this responsibility going forward; this allegation is limited to 2018. *See* Compl. ¶ 57. Moreover, this responsibility was removed in response to *Ahmad's* request for additional staff to permit him to complete the evaluations. *See id.* Accordingly, that HHC reassigned this responsibility to a "younger non-Pakistani" rather than accede to Ahmad's request for additional staffing to permit him to finish the evaluations does not plausibly support the inference that the 2018 evaluations were stripped from him based on discriminatory animus.

The Complaint also alleges that Abdullah suffered a diminution of duties. Significantly diminished material responsibilities can constitute an adverse employment action. *See Zoulas*, 400 F. Supp. 3d at 53. But Abdullah's allegations do not permit a reasonable inference that his responsibilities were thus diminished. Abdullah pleads that Nnoli, a supervisor pharmacist, removed his neonatal responsibilities and transferred him to the IV room, *see* Compl. ¶¶ 79–80, while Mina Eid, a younger non-Pakistani Level I pharmacist, is *permitted* to perform Level III clinical pharmacist tasks in the AICU, *see id.* ¶ 82. But Abdullah simultaneously pleads that due to his experience, he is *obligated* to perform Level III work without the commensurate pay or status. *See id.* ¶ 74. That Abdullah would prefer to perform these tasks in the neonatal unit rather than the IV unit does not constitute an adverse employment action. *See Brown*, 673 F.3d at 150 ("alteration of job responsibilities" not an adverse action (citation omitted)).

Rahman, a Level II intravenous chemotherapeutic pharmacist, alleges that at an unspecified point, he became the pharmacist with the most experience in compounding chemotherapy medications, a task usually assigned to Level III pharmacists. Compl. ¶ 116. Rahman was repeatedly asked to compound chemotherapy medications without being promoted to Level III or receiving the corresponding pay. *Id.* But Rahman does not plead that preparing

such medications, while perhaps "typically" assigned to a Level III pharmacist, is outside the job duties of a chemotherapeutic pharmacist.  The Complaint thus fails to plead facts sufficient to infer that his assignment of these duties constitute an adverse employment event.

Syed alleges that in or around September 2018, his schedule was changed such that his "daily responsibilities of generating interventions, clearing orders, preparing reports, and preparing profiles for rounds became more difficult to complete." *Id.* ¶ 141.  But like Ahmad, he does not allege that these changes materially impacted his job.  He does not allege, for example, that he had to work longer hours to complete these tasks.[12]  Accordingly, none of these plaintiffs have plausibly pled adverse action based on changes to their duties.

***Understaffing and Higher-Workload Shifts***: Ahmad and Hasan allege that they are subjected to higher workloads than their younger, non-Pakistani, non-Muslim counterparts, either as a result of understaffing or shift assignments.

Ahmad alleges that Tour III, which he supervises, has been routinely understaffed, which compromises his ability to perform his supervisory tasks, as he must "routinely" perform front-end, Level I work to compensate for the understaffing.  *See id.* ¶¶ 48–50.  He further pleads that Farooqi moves pharmacists from Tour III to fill emergency needs on Tours I and II, while moving responsibilities to Tour III.  *See id.* ¶ 54.  Ahmad also alleges that because the main pharmacy is understocked on his Tour, he routinely has to "retrieve important drugs from the stock room."  *Id.* ¶ 53.  "While an increased workload is considered only a mere alteration of job responsibilities, a workload heavily disproportionate to those similarly situated has been held to be an example of an adverse action."  *Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F.

---

[12] Syed also alleges that he experienced a diminution of duties in 2019.  However, his claim as pled as a retaliation claim.  It is addressed *infra*.

Supp. 2d 453, 461 (S.D.N.Y. 2007) (citing *Feingold*, 366 F.3d at 153); *see also Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014) (plaintiff required to perform seven duty weeks, while others only had to perform two weeks, plausibly alleged adverse action).  Ahmad, however, does not allege that he was obligated to work more hours as a result of understaffing. Nor does he, for example, allege that performing Level I duties when the pharmacy is in need or retrieving medications from the stockroom is outside the scope of his duties as an HHC pharmacist and supervisor.  *See Forest v. N.Y. State Off. of Mental Health*, 672 F. App'x 42, 45 n.3 (2d Cir. 2016) (summary order) ("[A]ssignments within an employee's job description are generally not materially adverse."); *Phillip v. Dep't of Sanitation*, No. 16 Civ. 2412 (MKB), 2019 WL 1004588, at *8 (E.D.N.Y. Feb. 28, 2019) (where "assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments does not, without more, rise to the level of an adverse employment action." (citation omitted)).  And Ahmad does not allege that his supervisory duties, aside from the 2018 evaluations, have been taken away and replaced with Level I work.  *Cf. Wallen v. Teknavo Grp.*, No. 12 Civ. 6196 (MKB) (SJB), 2019 WL 1435879, at *12 n.19 (E.D.N.Y. Mar. 30, 2019) ("[A] sudden reassignment to menial tasks alone can be an adverse employment action.").

In any event, even assuming the understaffing so materially altered Ahmad's job as to constitute an adverse action, Ahmad has not pled facts from which the Court could reasonably infer that the understaffing was due to a discriminatory motive.  Ahmad does not, for example, allege that this understaffing and increased workload affected only him or Pakistani-born, Muslim pharmacists as compared to others.  As pled, the understaffing problems would affect all pharmacists on Tour III.  Nor does he plead that he or other Pakistani-born, Muslim pharmacists are disproportionately burdened with tasks below their Level relative to similarly situated others.

Ahmad's own allegation that pharmacists are taken from his Tour to fill "emergency needs" on the other Tours further undercuts any reasonable inference of discriminatory motive.

As to Hasan, he alleges that he was assigned to work at the satellite pharmacies with the highest workloads, while "while junior, non-Pakistani pharmacists are scheduled at stations with lower workloads." Compl. ¶ 100. But, by Hasan's own allegations, these pharmacists are not similarly situated to him in that he is an experienced Level II pharmacist, and they are junior pharmacists. Nor has he alleged that working in the high-workload satellite pharmacies is outside his job description. *Phillip*, 2019 WL 1004588, at *8 (unfavorable assignments within employee's duties is not an adverse employment action).

***Denials of Sick Leave***: The Complaint alleges that Abdullah and Ahmed were discouraged from using or denied sick leave.

In June 2019, Go "chastised" Abdullah for using multiple sick days in a six-month period and told Abdullah this raised a "red flag." Compl. ¶ 83. But as defendants note, "merely being yelled at does not rise to the level of adverse employment action." *Rugg v. City of New York*, No. 18 Civ. 9762 (LAP), 2019 WL 3242493, at *5 (S.D.N.Y. July 8, 2019) (cleaned up). And despite his claim that he was "deni[ed] . . . sick leave," Pl. Opp'n at 16, there are no allegations that Abdullah was ever not permitted to take sick leave. And the Complaint does not point to a single similarly situated individual who took multiple sick days in a six-month period and was not chastised or warned against doing so. *See* Compl. ¶ 83 ("Upon information and belief, no non-Pakistani pharmacist received a 'red flag' for similar alleged conduct").

Ahmed alleges "upon information and belief" that, when he was injured at work at some unspecified time, Farooqi instructed Human Resources not to grant him sick leave, which delayed his disability benefits. *Id.* ¶ 90. Assuming that this denial is timely and constitutes an

adverse action, the Complaint has not pled facts sufficient to permit the inference that the denial was due to discrimination. The Complaint does not plead facts surrounding the denial of Ahmed's sick leave or whether others outside of his protected class were granted sick leave.

*Restricted Access to Areas*:[13] Ahmad alleges that his access to certain areas, including the pharmacy office, the conference room, copying and scanning facilities, and the procurement office, was restricted. *Id.* ¶ 51. But he does not allege facts supporting an inference that this materially impacted his job—or that he required access to these areas. And even assuming that this restricted access could constitute an adverse action, Ahmad has not pled facts making reasonable the inference that the restricted access was due to discrimination. He does not, for example, plead that younger, non-Pakistani, Muslim pharmacists enjoyed less restricted access.

Ahmad further alleges that Farooqi and her reports have interfered with his ability to use pharmacy resources, such as office and shelf space, to work on articles he drafts at the request of medical journals. *Id.* ¶ 55. On May 19, 2019, Ahmad alleges that Farooqi and two non-Pakistani reports "aggressively" approached and ordered him to remove research documents from an area near a window. *Id.* ¶ 52. Although these scholarship requests bear on Ahmad's role as a scientist, scholar, and adjunct professor, Ahmad does not plead that conducting research and drafting articles for medical journals are a part of his job as an HHC *pharmacist*. Accordingly, Farooqi's refusal to permit him to use pharmacy resources to carry out this research cannot constitute a "material change" in his job as a Level III pharmacist. In any event, Ahmad does not plead any facts from which the court could draw a reasonable inference that Farooqi's

---

[13] Syed also alleges that his access to rooms and lockers was restricted. However, because these allegations are part of his retaliation claim, they are addressed *infra*.

having denied him these resources was motivated by discrimination.  Ahmad does not, for example, allege whether others are permitted to use pharmacy resources for their scholarship.

### 4.    Hostile Work Environment Claims

Plaintiffs bring hostile work environment claims under Title VII and the NYSHRL against all defendants, and aiding-and-abetting claims against Carrington and Farooqi.

#### a.    *Legal Principles*

Hostile work environment claims under Title VII and the NYSHRL are judged by the same standard.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013).  "To establish a hostile work environment . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

The hostile work environment test has both objective and subjective elements.  "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."  *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris*, 510 U.S. at 21–22, 114 S. Ct. 367).  When deciding "whether a plaintiff suffered a hostile work environment, [the Court] must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Love v. Premier Util. Servs., LLC*, 186 F. Supp. 3d 248, 253 (E.D.N.Y. 2016) (quoting *Littlejohn*, 795 F.3d at 321).  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  *Terry v.*

*Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 374

(2d Cir. 2002)).

However, the Second Circuit has "cautioned against setting the bar too high" for such

claims at the motion to dismiss stage. *Terry*, 336 F.3d at 148. To survive a motion to dismiss, a

plaintiff must allege facts showing "she was faced with 'harassment . . . of such quality or

quantity that a reasonable employee would find the conditions of her employment altered for the

worse.'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Terry*, 336 F.3d at 148).

Accordingly, allegations that speak only to the "subjective belief of [plaintiffs] and [their] co-

workers [Huda, Farooq, and Zaman] that there was . . . discrimination afoot—however strongly

felt—[are] insufficient to satisfy [their] burden at the pleading stage." *Lenart v. Coach Inc.*,

131 F. Supp. 3d 61, 68 (S.D.N.Y. 2015) (quotations and citation omitted).

        *b.*    *Application*

        i.    Employer Liability

The Complaint alleges sufficient facts to state hostile work environment claims, based on

national origin (Pakistani) and religion (Muslim), with respect to Rahman, Raza, Syed, Ahmad,

and Abdullah. Each has clearly plead facts to meet their pleading burden with respect to the

subjective prong. *See, e.g.*, Compl. ¶¶ 121–22, 134, 145, 156, 164, 194, 200. As to the objective

prong:

Rahman alleges that on December 14, 2018, after he declined to stay past his shift to

meet his childcare obligations, Farooqi screamed at him, threatened to call the police, and

physically blocked him from exiting the pharmacy. *See id.* ¶ 122. Farooqi also threatened to

take "management action" against him. *Id.* Rahman alleges that he was "shaken, confused, and

humiliated in front his colleagues." *Id.* ¶ 123. Despite reporting the event to an H+H

compliance officer, Rahman never received a response. *See id.* ¶ 124. He further alleges that

Farooqi made unsafe requests that Rahman prepare chemotherapy medications using a regular IV laminar flow hood, rather than a chemotherapy hood. *Id.* ¶ 125.

Raza alleges that in 2015, after complaining to Farooqi about understaffing, he was transferred from the IV room to the outpatient room and told the transfer was a rotation that would be required of all pharmacists, although he was required to remain there for nine months. *See id.* ¶¶ 131–32. When he asked to be transferred back, "Farooqi reprimanded him and humiliated him in front of his colleagues." *Id.* ¶ 134. And although he was later transferred back to the main pharmacy, he "now ostensibly operates as a Level I pharmacist under the supervision of a non-Pakistani Level II pharmacist." *Id.* ¶ 135. To be sure, the 2015 episode falls outside the statute of limitations of both Title VII and the NYSHRL. But this incident is "background evidence in support" of Raza's hostile work environment claim based on his current treatment in the pharmacy as a Level I pharmacist. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Syed alleges a number of allegedly abusive incidents. When Syed prepared a presentation on medication safety, Farooqi mocked his spelling errors. Compl. ¶ 146. In 2018, Farooqi "raised her voice" and "insulted" Syed when he assisted with the preparation of a certain medication from the IV room. *Id.* ¶ 147. Syed alleges that she "engaged in an hour-long reprimand" and stated that she expected him to mix the medication by himself without assistance from the IV room. *Id.* In or about the end of September 2018, Syed alleges, Farooqi "raised her voice and insulted" Syed for not completing certain steps in communicating a medication recall, but did not take any action when she later learned that a non-Pakistani pharmacist had been at fault. *Id.* ¶ 148. Syed also makes allegations overlapping with his retaliation claims, including that he was frequently given additional assignments that amounted to an unreasonable workload,

assigned huddles on other shifts with short notice, and denied medical accommodations recommended by his physician.  *See id.* ¶¶ 155–56, 164–68.  Ahmad and Abdullah, too, describe hindering behavior of a similar quality, albeit with fewer manifestations than do Rahman, Raza, and Syed.  *See id.* ¶¶ 52, 57, 79–80, 83.

Each of these incidents is neutral on its face.  The Complaint does not allege that Farooqi or her reports used any ethnic, racial, or religious slurs or referenced any protected characteristic of any plaintiff.[14]  That gap undeniably is a weak spot in plaintiffs' claim of a hostile work environment at H+H toward Pakistani-born Muslim pharmacists.  But it is not fatal.  Incidents that are neutral on their face may be considered in assessing the totality of the circumstances on a hostile work environment claim where there is "some circumstantial or other basis for inferring that incidents []neutral on their face were in fact discriminatory."  *Alfano*, 294 F.3d at 378.  The Court may also consider events that an employee learns of second-hand, which, "not as impactful on one's environment as . . . direct" conduct, is still probative.  *Sletten v. LiquidHub, Inc.*, No. 13 Civ. 1146 (NRB), 2014 WL 3388866, at *7 (S.D.N.Y. July 11, 2014).  Here, for example, plaintiffs allege that non-plaintiff Zaman, former Assistant Director of the pharmacy, described Farooqi's tone as "often very threatening," Compl. ¶ 195, and that non-plaintiff Farooq wrote in his EEO complaint that "[Farooqi] doesn't let people complete their sentences and insults" them, *id.* ¶ 196.

It is fair to consider the plaintiffs' allegations in total in assessing whether a hostile work environment has been adequately pled.  The sheer accumulation of harassing, humiliating,

---

[14] The one exception is Syed, who alleges a stray reference arguably to disability, in that, that after he was hospitalized at HHC, he heard Go tell another member of the pharmacy staff, "in sum and substance," that "if these pharmacists are sick then why don't they retire."  *Id.* ¶ 177.

interfering, or obstructive behavior towards a group of employees with common nationality and religious faith who held a common position at H+H makes more plausible the allegations of each that the slings he experienced were consequential and traceable to discrimination.  And although the Complaint does not expressly allege that Rahman, Raza, Syed, Ahmad, and Abdullah were aware of each negative experience of each of the others (or those of Zaman and Farooq), they each worked in the same quarters—the main pharmacy at H+H.  The inference is fair that, in general, they would been aware of the pattern alleged of disproportionately hostile conduct received by the others.  And at a minimum, the plaintiffs were aware of one another's experiences by April 2019, when plaintiffs' counsel sent Carrington a letter outlining plaintiffs' allegations.  *Id.* ¶ 39.

To be sure, the allegations above would not, without more, likely withstand summary judgment.  On the pleadings, they do not appear solidly to reveal a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive." *Littlejohn*, 795 F.3d at 320 (citation omitted).  But on the more permissive standard governing the pleading stage, on which the allegations are to be viewed in the light most favorable to the plaintiffs, Rahman, Raza, Syed, Ahmad, and Abdullah adequately plead that they experienced workplace harassment of "such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse."  *Patane*, 508 F.3d at 113 (citation omitted).

The same cannot be said for Hasan, Kazmi, or Ahmed.  As to Hasan, the Complaint does not allege any harassment, humiliation, or abuse by Farooqi or her reports at all, let alone enough to alter his employment for the worse.  *See* Compl. ¶¶ 94–100.  And Hasan does not allege either to have witnessed or to have knowledge of the other alleged incidents of harassment.  The same is true as to Kazmi.  His allegations concern alleged disparate treatment, including in connection

with his not having been promoted.  But the allegations do not reasonably permit the inference

that the conditions of his employment were materially altered for the worse.  As for Ahmed, the

only allegation even tangentially relating to harassment is that Nnoli once asked him when he

was going to retire and told him that if he did not retire, his record would be "ruined."  *Id.* ¶ 92.

That is a far cry from sufficient.  And Ahmed's statement in his internal EEO complaint that he

perceived Farooqi to be "targeting pharmacists of Pakistani origin by indirectly pressuring them

to leave Harlem Hospital so that she can hire new employees of her choice," *id.* ¶ 93, goes to

Ahmed's subjective belief, but does not make the objective prong of a hostile work environment

claim, *see Lenart*, 131 F. Supp. 3d at 68 (allegations that speak only to subjective belief are

insufficient at pleading stage).

ii.       Individual and Aider-and-Abettor Liability

The Complaint also brings individual and aider-and-abettor claims against Carrington and

Farooqi for hostile work environment under the NYSHRL.  Claims of this nature are actionable.

*See Xiang*, 2020 WL 248941, at *5.  And Farooqi's participation in central events on which the

surviving hostile work environment claims rest is well-pled.  The Court sustains the individual

and aider-and-abettor claims against her.

As to Carrington, there are no allegations that she personally participated in creating a

hostile environment.  But, under the NYSHRL, "a supervisor's failure to take adequate remedial

measures can rise to the level of 'actual participation.'"  *Ananiadis*, 151 A.D.3d at 918 (citation

omitted).  Here, apart from inferences that can be drawn about her knowledge of allegedly

pervasive antagonism in the H+H workplace towards Pakistani/Muslim pharmacists, the

Complaint alleges that at a minimum, on April 30, 2019, plaintiffs' counsel sent a letter to CEO

Carrington outlining plaintiffs' allegations, Compl. ¶ 39, and the allegations as to Syed reflect

continuing actionable conduct after that date.  Accordingly, although the question is a close one,

50

the Court denies the motion to dismiss the aider-and-abettor claims against Carrington as they relate to an alleged hostile work environment.

### 5.     Retaliation

Plaintiffs bring retaliation claims under Title VII, the NYSHRL, and § 1983 alleging retaliation based on race, ethnicity, national origin, and religion.

#### a.     Legal Principles

To state a *prima facie* case for retaliation under Title VII, the NYSHRL, or § 1983 a plaintiff must establish that "(1) that [he] participated in an activity protected by Title VII, (2) that [his] participation was known to [his] employer, (3) that h[is] employer thereafter subjected [him] to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 330 (S.D.N.Y. 2020) (citation omitted) (Title VII and NYSHRL); *Vega*, 801 F.3d at 91 ("As in discrimination claims, the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII.").

The plaintiff's burden of proof at the *prima facie* stage is "*de minimis*." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). If the initial burden is met, "a 'presumption of retaliation'" arises, which the employer "may rebut by 'articulating a legitimate, non-retaliatory reason for the adverse employment action.'" *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (brackets omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). If the employer provides such a reason, "the presumption of retaliation dissipates," and the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citation omitted).

"As with discrimination claims, at the motion to dismiss stage, 'the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise

under *McDonnell Douglas* in the initial phase of . . . litigation.'" *Farmer*, 473 F. Supp. 3d at 331

(quoting *Duplan*, 888 F.3d at 625). For a retaliation claim to survive a motion to dismiss, "the

plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse

employment action—against him, (2) because he has opposed any unlawful employment

practice." *Duplan*, 888 F.3d at 625 (citation omitted). "As for causation, a plaintiff must

plausibly plead a connection between the act and his engagement in protected activity." *Vega*,

801 F.3d at 90.

          *b.*    *Application*

             i.    Retaliation Against Ahmad

Ahmad alleges that the September 9, 2019 Notice and Statement of Charges he received

are unmerited and fabricated. He alleges that they were retaliation for his EEO complaints and

complaints about pharmacy mismanagement. Compl. ¶¶ 60–61. Ahmad's complaints about

pharmacy mismanagement are not protected activities for the purposes of Title VII. *See Cruz v.

Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (protected activity is an "action taken to

protest or oppose statutorily prohibited discrimination"). But other complaints of his, beginning

in January 2019, qualify as such, to wit, his: (1) January 2019 internal EEO complaint; (2) April

2019 attorney letter to Carrington; and (3) June 21, 2019 EEOC complaint. *See* Compl. ¶¶ 5,

38–39, 60, 226.

Defendants argue that receiving disciplinary charges or being the subject of a disciplinary

hearing does not rise to the level of an adverse action. *See* Def. Mem. at 13 (citing *Fol v. City of

New York*, No. 01 Civ. 1115 (THK), 2003 WL 21556938, at *9 (S.D.N.Y. July 9, 2003)). But

*Fol* was decided before the decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53

(2006). Since then, the Second Circuit has recognized that "the harm element of a retaliation

claim is not to be analyzed in the same way as the harm from an alleged substantive act of

discrimination." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 43–44 (2d Cir. 2019) (noting that *Hicks*, 593 F.3d 159, expressly overruled the line of cases on which *Fol* relied). "Instead, the proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Id.* at 44 (cleaned up). Here, Ahmad alleges that the 24 specifications brought against him were all fabricated, including one regarding a workplace comment he allegedly made on a scheduled day off. *See* Compl. ¶ 61. A slew of falsified disciplinary charges could certainly plausibly deter another HHC pharmacist from reporting discrimination.

Finally, although the question is close, Ahmad has pled a causal connection between his protected activity and the adverse action. Close temporal proximity between the protected activity and the adverse action can establish causation. *See Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001). Although the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). Here, the disciplinary charges against Ahmad were brought approximately 2.5 months after the last of his protected activities: his EEOC charge. Although "temporal proximity alone will not be enough to support [Ahmad's] claim on summary judgment," *Huda*, 2021 WL 1163975, at *8, it is sufficient at the pleading stage.

As to individual and aider-and-abettor liability, the Complaint does not specifically allege that Farooqi participated in Ahmad's disciplinary actions. But, as explained *supra* pp. 31–32, at minimum, Farooqi would at least have been aware of disciplinary actions against pharmacists

under her supervision. *Ananiadis*, 151 A.D.3d at 918. And defendants do not argue that the individual claims against Farooqi should be dismissed for lack of participation. *See* Def. Reply at 5. Accordingly, the Court sustains the individual claims under § 1983 and the individual and aider-and-abettor claims against Farooqi under the NYSHRL. CEO Carrington likewise was informed of Ahmad's allegations based on plaintiffs' counsel's April 30, 2019 letter outlining them. Compl. ¶ 39. Accordingly, the Court denies defendants' motion to dismiss the individual claims under § 1983 and the individual and aider-and-abettor claims against Farooqi and Carrington under the NYSHRL.

ii.      Retaliation Against Syed

Defendants do not contest that Syed is a member of protected classes. And Syed engaged in at least three protected activities: (1) filing an internal EEO complaint in January 2019; (2) the April 30, 2019 letter; and (3) filing an EEOC complaint on July 1, 2019. *Id.* ¶¶ 5, 38–39, 41, 145. Syed alleges that as a result of these activities, he experienced the following retaliatory actions over the next year. First, shortly after the January 2019 EEOC complaint, he was transferred from the clinical pharmacy, where he had been a supervisor and medication safety officer, to the procurement department. *Id.* ¶¶ 137, 150. Second, between April and October 2019, he was given substantial new tasks on top of his new procurement duties, requiring him to come in before his scheduled shift, even after requesting to be relieved of some tasks as a medical accommodation. *Id.* ¶¶ 154, 158–59, 160–62, 167–72. Third, in January 2020, Syed alleges that he was effectively demoted to a Level I pharmacist and stripped of supervisory duties. *Id.* ¶¶ 179–80. A demotion or being "relegated to work normally performed by more junior employees" can constitute an adverse action, *Wilkinson v. New York State*, No. 18 Civ. 4148 (PKC) (LB), 2019 WL 5423573, at *13 (E.D.N.Y. Oct. 22, 2019), as can a disproportionate increase in workload compared to those similarly situated, *see Delgado*, 485 F. Supp. 2d at 461.

Punitive scheduling can also constitute an adverse action for the purposes of retaliation. *Hicks*, 593 F.3d at 169.

Syed has adequately pled retaliatory causation as to these actions. The first of the series of allegedly onerous changes to Syed's job began "only days" after his first protected activity, Compl. ¶ 150; these increased in severity after the April 2019 letter. Although his assignment to the satellite pharmacy occurred approximately six months after his last protected activity (Syed's EEOC complaint), it followed a pattern of alleged retaliatory actions following protected activities over a one-year period. That is sufficient at the pleadings stage.

As to individual and aider-and-abettor liability, the Complaint alleges that Farooqi initiated Syed's transfer to the procurement unit. *Id.* And most alleged retaliatory actions occurred after the letter to Carrington complaining of discrimination against Pakistani, Muslim pharmacists. Accordingly, the Court sustains the individual claims under § 1983 and the individual and aider-and-abettor claims under the NYSHRL against Carrington and Farooqi.

iii. Other Claims of Retaliation

The remaining defendants' allegations do not, however, state a claim for retaliation under Title VII, the NYSHRL, and § 1983.

Ahmed, Hasan, Kazmi, and Raza plead that they were "retaliated" against. *See id.* ¶¶ 88–90 (Ahmed), 100 (Hasan), 108–09 (Kazmi), 135–36 (Raza). But they do not identify any protected activity, *i.e.*, activity taken in opposition to unlawful discrimination. *See Cruz*, 202 F.3d at 566; *see also Vega*, 801 F.3d at 88 (pleading standards for § 1983 retaliation claims mirror Title VII). And the adverse actions alleged pre-dated the January 2019 internal EEO complaint, in some cases by years.

55

Abdullah alleges that in January 2019, he was transferred to the IV room.  *See* Compl. ¶ 81.  But the Complaint does not allege that he was among the seven pharmacists who filed internal EEO complaints in January 2019, or that this transfer occurred after those complaints.

Finally, Rahman alleges that in May 2019, he was denied days off for Ramadan.  *See id.* ¶¶ 118–19.  But plaintiffs do not cite caselaw that denial of time off on a single occasion rises to the level of an action likely to discourage others from reporting discrimination.

Accordingly, the Court denies the remaining defendants' retaliation claims.

## C.    NYCHRL Claims

Plaintiffs bring claims against all defendants for discrimination and retaliation under the NYCHRL, including individual and aider-and-abettor claims against Carrington and Farooqi.

### 1.    Legal Principles

#### a.    *Discrimination*

Under the NYCHRL, "there are not separate standards for 'discrimination' and 'harassment' claims; rather, 'there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based'" a protected characteristic. *Clarke v. InterContinental Hotels Grp., PLC*, No. 12 Civ. 2671 (JPO), 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) (quoting *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012)).  "NYCHRL claims are to be reviewed more liberally than Title VII claims, and the provisions of the NYCHRL must be construed broadly in favor of plaintiffs alleging discrimination."  *Levy v. Legal Aid Soc'y*, 408 F. Supp. 3d 209, 217 (E.D.N.Y. 2019) (quoting *Johnson v. Andy Frain Servs., Inc.*, 638 F. App'x 68, 71 (2d Cir. 2016) (summary order)); *see also Williams v. N.Y.C. Transit Auth.*, 171 A.D.3d 990, 992 (2d Dep't 2019).  Claims under the NYCHRL must be analyzed separately, as conduct not actionable under Title VII, the NYSHRL,

or § 1983, may be "actionable under the broader New York City standards." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

"[W]here an adverse employment action is shown to be 'motivated by [unlawful] animus, even in part, the defendant may be held liable' under the NYCHRL." *Williams*, 171 A.D.3d at 992–93 (quoting *Singh v. Covenant Aviation Sec., LLC*, 131 A.D.3d 1158, 1161 (2d Dep't 2015)). But a plaintiff's "mere subjective belief that he was discriminated against because of his [race, religion, or national origin] does not sustain a . . . discrimination claim." *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 309 (E.D.N.Y. 2014) (citation omitted), *aff'd*, 594 F. App'x 29 (2d Cir. 2015) (summary order).

For discrimination claims based on harassment or a hostile environment, the NYCHRL's pleading standard is lower than the NYSHRL's. It imposes liability for harassment short of "severe or pervasive," although the severity and pervasiveness of misconduct is germane to damages. *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 76 (1st Dep't 2009) (citation omitted). Nevertheless, even under the NYCHRL, "'petty slights or trivial inconveniences" are not actionable. *Id.* at 80.

### b.    Retaliation

Like discrimination claims, NYCHRL retaliation claims are analyzed separately. "The elements of a prima facie case of retaliation under Title VII, the NYSHRL, and the NYCHRL are identical, except that the NYCHRL employs a broader standard of an adverse employment action than its federal and state counterparts." *Smith*, 385 F. Supp. 3d at 345–46 (cleaned up).

### c.    Individual and Aider-and-Abettor Liability

"The NYCHRL provides a broader basis for direct individual liability than the NYSHRL." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012). It makes it "an unlawful discriminatory practice . . . [f]or an *employer or an employee or agent*

*thereof*, because of the . . . [protected status] . . . of any person . . . to . . . discriminate against

such person in compensation or in terms, conditions or privileges of employment."  N.Y.C.

Admin. Code § 8-107(1)(a) (emphasis added).  "Thus, the NYCHRL provides for individual

liability of an employee regardless of ownership or decisionmaking power."  *Malena*, 886 F.

Supp. 2d at 366 (quotation marks omitted).  Thus, "[a]n individual defendant may . . . be held

personally liable under the NYCHRL if [she] participates in the conduct giving rise to the

discrimination claim."  *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 344 (S.D.N.Y.

2009).  Aiding and abetting liability is also available under the NYCHRL and is "susceptible to

the same standard [as the NYSHRL] . . . as [the] language of the two laws is virtually identical."

*Xiang*, 2020 WL 248941, at *7 (quotation marks omitted).

### 2.    Application

#### a.    *Discrimination Claims*

As reviewed above, various plaintiffs have stated claims for disparate treatment and

hostile work environment under Title VII, the NYSHRL, and/or § 1983.  Because the standards

of these statutes are as or more strict than the NYCHRL, plaintiffs' parallel claims to these under

the NYCHRL necessarily survive, too.  *See Farmer*, 473 F. Supp. 3d at 327.  The same is true as

to claims that have survived against Farooqi and Carrington, insofar as the NYCHRL permits

broader liability for individuals than the NYSHRL.

As to plaintiffs' discrimination claims that did not survive under federal and state law,

these also fail to state a claim under the NYCHRL, notwithstanding that law's broader reach.

The claims of worse treatment, *e.g.*, lower performance evaluation and changes to duties and

schedules, that failed to plead an adverse employment action, *see supra* pp. 34–45, similarly fail

under the NYCHRL.  *See Bermudez v. City of New York*, 783 F. Supp. 2d 560, 577 (S.D.N.Y.

2011) ("[A]n adverse employment action under the NYCHRL is defined the same as under the

NYSHRL.").  And as to harassment, with respect to Hasan, Kazmi, and Ahmed, the Complaint alleges only sporadic instances of harassment or none at all.  *See supra* pp. 49–50.  The Court accordingly dismisses these NYCHRL claims.

b.      *Retaliation Claims*

To the extent so held above, plaintiffs have also stated viable retaliation claims under Title VII, the NYSHRL, and § 1983.  Plaintiffs' parallel NYCHRL claims based on the same conduct necessarily also survive, having cleared the stricter standards of federal and state law. *See Farmer*, 473 F. Supp. 3d at 334.  Where plaintiffs' claims against Farooqi and Carrington have survived, the parallel NYCHRL claims also survive.

Again, however, notwithstanding the NYCHRL's broader reach, plaintiffs' NYCHRL retaliation claims that track those that failed under federal and state law also fail.  The Complaint does not allege that Ahmed, Hasan, Kazmi, and Raza engaged in any protected activity before the alleged retaliation.  *See supra* pp. 55–56.  As to Abdullah, the Complaint does not allege that he was among the seven pharmacists who filed internal EEO complaints in January 2019 or that his transfer occurred after those complaints.  Rahman's allegation that in May 2019, he was denied days off for Ramadan presents a closer call.  But it ultimately fails too, because plaintiffs do not cite authority that a single denial of time off, even for an important religious holiday, is likely to discourage a reasonable person from reporting discrimination.  Accordingly, the Court dismisses these NYCHRL claims.

### D.      Conspiracy to Interfere with Plaintiffs' Civil Rights

Plaintiffs next allege that Carrington and Farooqi conspired to interfere with plaintiffs' civil rights in violation of 42 U.S.C. § 1985(3).  The elements of a § 1985(3) claim are:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby

59

> a person is either injured in his person or property or deprived of any right of a
> citizen of the United States.

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (citing

*United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 828–29

(1983)).  There must also be "some racial, or perhaps otherwise class-based, invidiously

discriminatory animus behind the conspirators' action."  *Scott*, 463 U.S. at 829 (citation omitted).

This claim fails for multiple reasons.  First, under the intracorporate conspiracy doctrine, the

"employees of a single corporate or municipal entity, each acting within the scope of his or her

employment, are legally incapable of conspiring together."  *K.D. ex rel. Duncan v. White Plains

Sch. Dist.*, 921 F. Supp. 2d 197, 210 (S.D.N.Y. 2013).  The Second Circuit has extended the

doctrine to § 1985 claims, including ones brought against municipal entities.  *See Fed. Ins. Co. v.

United States*, 882 F.3d 348, 368 n.14 (2d Cir. 2018) (extending intracorporate conspiracy

doctrine to conspiracies to interfere with civil rights in violation of 42 U.S.C. § 1985); *Murphy v.

City of Stamford*, 634 F. App'x 804, 805 (2d Cir. 2015) (summary order) (applying

intercorporate conspiracy doctrine to employees and agents of defendant city).  To be sure, there

is an exception to the intracorporate conspiracy doctrine, for when "individuals within a single

entity . . . are pursuing personal interests wholly separate and apart from the entity."  *K.D. ex rel.

Duncan*, 921 F. Supp. 2d at 210.  But the Complaint does not allege that Carrington and Farooqi

acted solely in their own personal interests.  It alleges the opposite, stating that at all relevant

times, "Carrington and Farooqi have acted . . . within their authority as employees, officers,

and/or agents of [H+H]."  Compl. ¶ 26.  It further alleges that H+H is liable for Carrington's and

Farooqi's behavior under the doctrine of *respondeat superior* for the state law claims, *id.* ¶ 28,

which, under New York law, requires that the employees acted *within* the scope of their employment, *see Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999).[15]

Second, even if the intracorporate conspiracy doctrine did not block the § 1985(3) claim, the Complaint lacks factual allegations support an inference of an agreement between Farooqi and Carrington. The Complaint's sole allegations on this point are conclusory recitations of the statutory elements. *See* Compl. ¶¶ 266–67. Even drawing all reasonable inferences in favor of the plaintiffs, plaintiffs have not adequately pled that the individual defendants engaged in a conspiracy to deprive plaintiffs of their civil rights.

### E.    First Amendment Retaliation Claims

Plaintiffs next allege that defendants violated plaintiffs' free speech rights under the First Amendment and Article 1 § 11 of New York's Constitution by retaliating for protected speech. The Complaint does not specify the acts of speech or retaliation on which these claims turn. *See id.* ¶¶ 233–35. Plaintiffs' opposition identifies three instances of speech to which defendants purportedly retaliated: (1) the January 2019 internal EEO complaints from the seven pharmacists; (2) Ahmad's June 2019 EEOC complaint, and Syed's July 2019 EEOC complaint; and (3) Ahmad's complaint about pharmacy procedure.

Plaintiffs' status as public employees informs the analysis of these claims. The State has "interests as an employer in regulating [plaintiffs'] speech . . . that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Farooq*, 2020 WL 5018387, at *4 (quoting *Pickering v. Bd. Of Ed. of Twp. High Sch. Dist. 205, Will*

---

[15] Plaintiffs argue that Carrington and Farooqi acted with "nefarious purpose" to eliminate older, Pakistani pharmacists, Pl. Opp'n at 28, but that allegation, even if pled, would be insufficient, *see Nollah v. New York City*, No. 17 Civ. 634 (JPO), 2018 WL 4636847, at *5 (S.D.N.Y. Sept. 27, 2018) ("[P]ersonal bias alone does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine." (internal quotations and citation omitted)).

*Cnty., Ill.*, 391 U.S. 563, 568 (1968)).  To state a *prima facie* case for First Amendment

retaliation, a public employee must demonstrate: "(1) his speech or conduct was protected by the

First Amendment; (2) the defendant took an adverse action against him; and (3) there was a

causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley*

*Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).

  As to the first element, "[a] court conducts a two-step inquiry to determine whether a

public employee's speech is protected." *Matthews v. City of New York*, 779 F.3d 167, 172

(2d Cir. 2015).  The first examines whether "the employee spoke as a citizen on a matter of

public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 410 (2006).  To determine whether a public

employee spoke as a citizen, a court asks "(A) did the speech fall outside of the employee's

'official responsibilities,' and (B) does a civilian analogue exist?" *Alvarez v. Staple*, 345 F.

Supp. 3d 320, 329 (S.D.N.Y. 2018) (quoting *Matthews*, 779 F.3d at 173).  If the public employee

did not speak as a citizen on a matter of public concern, "the inquiry ends—the speech was not

constitutionally protected." *Id.*  If the public employee did speak as a citizen on a matter of

public concern, the court proceeds to the second inquiry: whether the state had "'an adequate

justification for treating the employee differently from any other member of the [general] public'

based on the government's needs as an employer." *Lane v. Franks*, 573 U.S. 228, 242 (2014)

(quoting *Garcetti*, 547 U.S. at 418).

###### 1.      January 2019 Internal Complaints

Plaintiffs first assert that their January 2019 internal complaints to H+H's EEO office alleging discrimination based on race, color, national origin, religion, and age constitutes protected speech which prompted retaliation.[16]  *See* Pl. Opp'n at 28–30.

Widespread employment discrimination in a public office can be an issue of public concern, particularly where it has the potential to impact public safety.  *See, e.g.*, *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005) ("[W]hen a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern."); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir. 1993) (police department employment policies a matter of public concern).  But, even assuming the internal complaint here related to a matter of public concern, the Complaint fails to allege that plaintiffs spoke in their capacities as private citizens, as opposed to as government employees.

The January 2019 complaints to H+H's internal EEO office were made pursuant to plaintiffs' official duties, using a channel for which the Complaint does not suggest any public analogue.  The existence of a public analogue matters, because it "bear[s] on the perspective of the speaker—whether the public employee is speaking as a citizen."  *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 204 (2d Cir. 2010).  A public analogue is a "channel of discourse available to non-employee citizens."  *Id.*  Here, plaintiffs themselves characterize their complaints as "internal," Compl. ¶ 38, and do not allege that these "internal . . . complaints made through employment-related channels[ ] were . . . conveyed to the public,"

---

[16] The Complaint does not specify whether each plaintiff in this case was among the seven pharmacists who filed the January 2019 internal complaint.  *See* Compl. ¶ 38.  It does allege that Ahmad, Ahmed, Kazmi, and Syed made internal complaints to H+H's EEO office.  *See id.* ¶¶ 60, 93, 111, 145.  Kazmi made his complaint in March 2019.  *Id.* ¶ 111.  But the Complaint does not clearly allege that Abdullah, Hasan, Rahman, or Raza ever did so.

*Milardo v. Town of Westbrook*, 120 F. Supp. 3d 206, 217 (D. Conn. 2015) (citing *Weintraub*, 593 F.3d at 402–03).  Internal grievances are usually considered to be made "pursuant to [plaintiff's] job duties."  *Gonzalez v. City of New York*, 442 F. Supp. 3d 665, 697 (S.D.N.Y. 2020) (plaintiff was speaking as employee pursuant to official duties by filing internal grievance), *aff'd*, No. 20 Civ. 1126, 2021 WL 438894 (2d Cir. Feb. 9, 2021).  The Complaint does not allege facts that suggest their particular grievances to be otherwise.

Seeking to rescue this claim, plaintiffs' opposition labels this internal grievance an "attempt[ ] to unveil the ongoing discrimination against older Pakistani pharmacists."  Pl. Opp'n at 30.  But they do not explain how an internal complaint to which the public does not have access would have this unveiling effect.  The Complaint is devoid of allegations from which the Court can infer that, in making an internal complaint through H+H's employee-grievance procedure, plaintiffs spoke as citizens.

*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011), on which plaintiffs rely, is distinguishable. *Jackler* concerned a police officer's First Amendment right to refuse to retract a truthful statement he had made during an excessive force investigation.  *See id.* at 240–42.  Importantly, in *Jackler*, the officer's allegations corroborated a civilian complaint, and defendants repeatedly attempted to force the officer to withdraw his truthful report and instead file a false one.  *See id.* at 231, 241; *see also Farooq*, 2020 WL 5018387, at *5.  There is nothing analogous here.

Accordingly, because plaintiffs were speaking as public employees in filing their internal complaints, plaintiffs' First Amendment claims predicated on these complaints are dismissed.

## 2.    Ahmad's and Syed's EEOC Complaints

Ahmad alleges that he experienced retaliation in violation of his First Amendment rights as a result of filing his June 2019 EEOC complaint, to wit, the bringing of 24 disciplinary

charges against him.  *See* Compl. ¶ 226.[17]  This was an adverse employment action, as the Court has held in connection with Ahmad's Title VII and § 1983 claims.  *See supra* pp. 52–54.  And it occurred sufficiently close in time to the EEOC complaint to make plausible the inference of retaliatory causation.  The same is true for Syed's July 2019 EEOC complaint and his alleged *de facto* demotion that followed in January 2020.  *See supra* pp. 54–55.  The sole issue as to the viability of these claims on the pleadings is thus whether Ahmad's and Syed's EEOC complaints were the protected speech of private citizens, or the nonprotected speech of employees.

A report to an external agency favors a finding that the complainant spoke as a citizen. *See Raymond v. City of New York*, 317 F. Supp. 3d 746, 781 (S.D.N.Y. 2018) ("[C]ourts have repeatedly emphasized a public employee's complaint to outside or external agencies as a factor weighing heavily in favor of finding that the employee was acting as a private citizen." (quotations and citation omitted)).  To be sure, the Complaint does not allege, *in haec verba*, that Ahmad's EEOC complaint had "a broader public purpose" of exposing the widespread discrimination against Pakistani pharmacists at H+H, as opposed to being "calculated to redress personal grievances."  *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) (citation omitted).  But drawing all reasonable inferences in favor of Ahmad and Syed as the non-moving parties, and viewing these allegations in the context of the Complaint's other allegations, the inference is fair that Ahmad's and Syed's EEOC complaints were protected speech intended to publicly air this grievance.  Accordingly, the Court sustains their claims.

---

[17] The other plaintiffs also filed EEOC complaints, but do not allege that they were retaliated against for doing so.

### 3.    Pharmacy Procedure Complaints[18]

Finally, plaintiffs argue that Ahmad was "abruptly suspended" for "attempting to speak the truth about proper pharmacy procedure."  Pl. Opp'n at 30.  However, plaintiffs do not cite any aspect of the Complaint in support of this thesis, and the Complaint does not include Ahmad among the three pharmacists who were suspended.  *See* Compl. ¶¶ 91 (Ahmed for not wearing gloves while fulfilling an emergency medication request), 222 (Farooq allegedly for notifying supervisors about expired medications), 224 (Huda purportedly for unprofessional behavior).  As to those three, the Complaint does not allege that Ahmed made a statement or took any protected action that resulted in his suspension, *id.* ¶¶ 85–91, and Farooq and Huda are not plaintiffs here.

To the extent plaintiffs mean this argument to refer to Ahmad's and Raza's 2015 complaints to Farooqi about understaffing on evening shifts and the effects this understaffing could have on patient safety, *see id.* ¶ 131, that claim is time-barred.  First Amendment retaliation claims are subject to a three-year statute of limitations, *see Smith v. N.Y.C. Dep't of Educ.*, 524 F. App'x 730, 732 (2d Cir. 2013) (summary order).  Plaintiffs do not dispute that the claim is untimely.  In any event, complaints about staff levels on pharmacy shifts do not qualify as protected speech, as they are "part-and-parcel of [Ahmad's and Raza's] concerns about [their] ability to properly execute [their] duties."  *Matthews*, 779 F.3d at 173.

---

[18] Defendants identify other expressed grievances cited in the Complaint that theoretically could have been intended as the basis of a First Amendment retaliation claim.  *See* Def. Mem. at 22–24.  Because plaintiffs have not addressed these allegations, claims based on them, if intended, are waived.  *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08 Civ. 442 (TPG), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").  In any event, these complaints, such as Abdullah's about his inability to hear the fire alarm in the IV room, *see, e.g.*, Compl. ¶ 84, were internal and well within the pharmacists' official duties, and so are not protected speech.

Accordingly, the Court dismisses any First Amendment retaliation claims based on Ahmad's 2015 complaints.

### F.    *Monell* Claims

Plaintiffs bring § 1983 *Monell* claims against H+H, alleging that their constitutional rights were violated as a result of an unlawful H+H policy, practice, and custom adopted and implemented by policymakers Carrington and Farooqi.

A plaintiff cannot establish municipal liability under § 1983 based on a theory of *respondeat superior*.  To hold a municipality liable under § 1983 for unconstitutional actions of its employees, a plaintiff must establish a municipal policy or custom that directly subjected her to a constitutional violation.  *See Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("[C]onstitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation." (citation omitted)).

A plaintiff can establish the existence of a policy or custom by showing:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted) (collecting cases).

Absent an underlying constitutional violation, the Court need not address municipal liability.  *See, e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).  Accordingly,

H+H cannot be subject to *Monell* liability with respect to the considerable number of claims under § 1981, § 1983, and § 1985 that have been dismissed.  However, to the extent the Court has sustained some § 1983 claims against Carrington and Farooqi in their individual capacities, a *Monell* claim has the potential to be viable.  With respect to these, plaintiffs assert H+H's *Monell* liability under, apparently, the middle two bases above: that there existed a widespread policy, practice or custom of discriminating against Pakistani-born Muslim pharmacists; and that Carrington and Farooqi put in a place a policy to discriminate against such persons.

Neither theory, however, is viably pled.

First, the pleadings, although reflecting instances of allegedly discriminatory conduct against such persons, fall short of pleading an alleged policy or custom to do so.

Plaintiffs, indeed, formulate the alleged illegal policy in a manner that is a mismatch for the facts pled here.  They contend that HHS has a policy of disciplining older, Pakistani Muslim pharmacists "while flouting established protections under the CBA and [H+H's] Rules regarding pre-hearing suspensions."  Pl. Opp'n at 24–25.  But although plaintiffs cite to Farooq's and Huda's respective cases in this District, *see id.*, none of the eight plaintiffs in *this* case has claimed to have suffered a pre-hearing suspension.  On the contrary, as of the filing of the Complaint, Ahmad had yet to have a disciplinary hearing or received any punishment.  Compl. ¶¶ 60–62.  And Ahmed has alleged that he received a pre-discipline review, albeit one which his supervisor Ahmad was not permitted to attend.  *Id.* ¶ 91.  Plaintiffs therefore have failed to plead adequately the policy they posit.  And, had such a policy been pled, these plaintiffs would not have standing to challenge it.[19]

---

[19] In Huda's case, in which the plaintiff is represented by the same counsel as those here, the district court dismissed a nearly identical *Monell* claim.  *See Huda*, 2021 WL 1163975, at *5.

Second, to the extent that plaintiffs posit that Farooqi and Carrington are final policymakers at H+H, and therefore that any individual discriminatory act of theirs constituted municipal policy, *see id.* ¶¶ 254–60, that claim fails too. "The Supreme Court has said that a municipality may be liable for the acts of a single official—but only if that official is someone 'whose edicts or acts may fairly be said to represent official policy' for the entire municipality." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (quoting *Monell*, 436 U.S. at 694)); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). But merely because an employee of the municipality has the *authority* to make decisions that are unreviewable does not make that employee a policymaker. *Agosto*, 982 F.3d at 98. "That [employees] may have had hiring or firing authority is not enough; otherwise, any adverse employment action by a manager would subject a municipality to *Monell* liability." *Huda*, 2021 WL 1163975, at *5. "[B]y equating a final decisionmaker with a final policymaker, [this] approach would effectively impose *respondeat superior* liability—making the municipality liable for the conduct of its employees—in violation of *Monell* itself." *Agosto*, 982 F.3d at 100.

Here, although the Complaint declares generally that Farooqi and Carrington are "final policymakers," Compl. ¶ 245, it does not plead that they have policymaking authority for H+H over personnel or disciplinary matters, let alone facts to support that inference. Plaintiffs argue that Farooqi's participation in disciplinary matters is evident from the fact that she is copied on disciplinary letters[20] and that she "has direct control over the hiring and firing practices." *See* Pl. Opp'n at 25 (citing Compl. ¶¶ 41–51). But these allegations suggest only that, as a supervisor, Farooqi participated in, and had authority to make, hiring and firing decisions, not that she is the

---

[20] Plaintiffs reference exhibits to the Complaint in their opposition, but the Complaint in this action was not filed with accompanying exhibits. *See* Pl. Opp'n at 25.

Case 1:20-cv-00675-PAE   Document 37   Filed 03/31/21   Page 70 of 73

final policymaker within H+H with respect to personnel and discipline. And as to Carrington, who as pled outranked Farooqi, as reviewed herein, she is not plausibly pled to have authored, had foreknowledge of, or carried out any of the discriminatory acts that the Court has found well-pled. Carrington's potential liability, as reviewed here, stems from her alleged failure to halt those acts of discrimination and retaliation by others, predominantly Farooqi. *See id.* That allegation of a supervisory lapse sufficed, narrowly, to sustain certain aiding and abetting claims against Carrington. It does not, however, make her a final policymaker over personnel matters for H+H, or support imposing *Monell* liability on the City.

Accordingly, plaintiffs have not stated a viable *Monell* claim.

### G.    Claims Under the New York Constitution

Plaintiffs also bring free speech and equal protection claims under Article 1 of the New York Constitution. Defendants move to dismiss, on the grounds that plaintiffs have failed to file a notice of claim under New York General Municipal Law § 50-e and do not have a private right of action under the New York Constitution.

Plaintiffs' claims under the New York Constitution must indeed all be dismissed because plaintiffs have failed to file a notice of claim. *See* N.Y. Gen. Mun. Law § 50-e. A "[p]laintiff must file a notice of claim as a condition precedent to the filing of constitutional torts under the New York State Constitution." *Pflaum v. Town of Stuyvesant*, 937 F. Supp. 2d 289, 308 (N.D.N.Y. 2013) (dismissing claims under New York Constitution while sustaining parallel federal claims under § 1983); *see also Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 709 (S.D.N.Y. 2011) (notice of claims required for torts under state but not federal constitution); *Henneberger v. County of Nassau*, 465 F. Supp. 2d 176, 199 (E.D.N.Y. 2006) (dismissing state constitutional claims against officers in official capacities and state for failure to file notice of claim). Defendants raised this potential deficiency in their motion to

70

dismiss, but plaintiffs ignore it their opposition, and nowhere claim to have complied with section 50-e.

In any event, these claims are separately defective for failure to state a claim, because plaintiffs do not have a private right of action under Article 1.  In general, "New York courts will only imply a private right of action under the state constitution where no alternative remedy is available to the plaintiff."  *Felmine v. City of New York*, No. 09 Civ. 3768 (CBA) (JO), 2012 WL 1999863, at *6 (E.D.N.Y. June 4, 2012) (collecting cases).  To be sure, that principle has been criticized to the extent it has been applied where the only alternate remedies arise from federal law.  *See Soliman v. City of New York*, No. 15 Civ. 5310 (PKC) (RER), 2017 WL 1229730, at *9 (E.D.N.Y. Mar. 31, 2017) ("[T]hese cases do not identify any basis in New York law to deny a right of action under the New York Constitution based on remedies that may be obtainable under federal law.").  But the Second Circuit and district courts in this Circuit have consistently applied that principle to dismiss state constitutional claims where the plaintiff had remedies available under § 1983.  *See, e.g.*, *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order); *Sullivan v. Metro. Transit Auth. Police Dep't*, No. 13 Civ. 7677 (NRB), 2017 WL 4326058, at *10 (S.D.N.Y. Sept. 13, 2017); *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 520 (S.D.N.Y. 2013).  Courts have applied this principle to dismiss the very types of claims at issue here—free speech and equal protection claims under the New York Constitution—in deference to the First Amendment retaliation claims and equal protection claims available to the plaintiff under § 1983.  *See Sullivan*, 2017 WL 4326058, at *10 (free speech); *Dava v. City of New York*, No. 15 Civ. 08575 (ALC), 2016 WL 4532203, at *10–11 (S.D.N.Y. Aug. 29, 2016) (equal protection).

It is no response that, with the exception of Ahmad and Syed, plaintiffs have not stated plausible claims under § 1983 for First Amendment retaliation.  "[I]t is the availability of

remedies under Section 1983, and not their success, that precludes a New York State Constitution claim." *Sullivan*, 2017 WL 4326058, at \*10; *see also Allen*, 665 F. App'x at 13 (affirming dismissal of state constitution claims where § 1983 and common law remedies were available, while affirming dismissal of the § 1983 and common law claims).  Here, plaintiffs had a right under § 1983 to pursue First Amendment retaliation claims (as well as equal protection claims).  The availability of such claims precludes plaintiffs' claim to an implied right of action under the parallel provisions of the New York Constitution.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part.  Specifically, the Court denies defendants' motion to dismiss with respect to the following claims:

- Abdullah's failure-to-promote claims related to the 2018 promotions under Title VII against H+H (for the December 2018 promotion), under § 1983 against Farooqi, and under the NYSHRL and the NYCHRL against H+H and Farooqi;

- Ahmed's discriminatory discipline claims under § 1983 against Farooqi, and under the NYSHRL and the NYCHRL against H+H and Farooqi;

- Raza's disparate treatment claims related to his diminution of duties under Title VII against H+H, under § 1983 against Farooqi, and under the NYSHRL and the NYCHRL against H+H and Farooqi;

- Kazmi's disparate treatment claims related to his shift change under § 1983 against Farooqi, and under the NYSHRL and the NYCHRL against H+H and Farooqi;

- Rahman's, Raza's, Syed's, Ahmad's, and Abdullah's hostile work environment claims under Title VII against H+H, and under the NYSHRL and NYCHRL against H+H, Farooqi, and Carrington;

- Ahmad's retaliation claims under Title VII against H+H, under § 1983 against Farooqi and Carrington, and under the NYSHRL and the NYCHRL against H+H, Farooqi, and Carrington;

- Syed's retaliation claims under Title VII against H+H, under § 1983 against Farooqi and Carrington, and under the NYSHRL and the NYCHRL against H+H, Farooqi, and Carrington; and

- Ahmad's and Syed's federal free speech retaliation claims under § 1983 against Farooqi and Carrington.

Kazmi's failure-to-promote claims with respect to the 2017 promotion are dismissed without prejudice.[21]

The Court grants defendants' motion to dismiss as to all other claims with prejudice. The Clerk of Court is respectfully directed to terminate the motion pending at docket 23.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 31, 2021
        New York, New York

---

[21] If Kazmi seeks leave to amend the Complaint as to his failure-to-promote claims, he is directed to file, within two weeks of the date of this order, a motion for leave to amend the Complaint and a proposed order.